JOHN B. TYLER

*v.*

WILLIAM A. TYLER.

*Filed at Ottawa October 2, 1888.*

1. FRAUDULENT CONVEYANCE—*character of claims within the statute.* The fourth section of the Statute of Frauds, which makes void any gifts, grants, etc., made with intent to hinder, delay or defraud any "creditor or other person," applies to transfers of a husband made to delay, hinder and defraud his wife in the assertion of her right to a separate maintenance.

2. In anticipation of legal steps being taken by his wife for a separate maintenance, the husband made an assignment of certain securities to his son, amounting to about $100,000, upon the expressed consideration of $10,000, and the agreement of the son to pay him, for and during his natural life, the sum of $5000 per annum, to be paid semi-annually from the date of the writing, the father to be the sole judge of his necessities, and the son being required to make such payments when demanded: *Held,* that the assignment, upon its face, was plainly fraudulent, in that it attempted to secure the use of the property to the father to the exclusion of all others having claims upon him.

3. SAME—*right of grantor to a reconveyance.* In addition to the assignment of the greater part of the securities owned by the husband, for the purpose of delaying, hindering and defrauding his wife in respect of the anticipated suit for separate maintenance, he also caused his lands to be conveyed to the son for the same purpose. The son gave the grantor his written agreement to give him back the securities and lands when demanded. The wife obtained a decree for separate maintenance, when the grantor executed to his son another agreement, antedated, whereby he released the son from the payment of the $5000 per annum, on condition the son should furnish him with bed and board in his family during life, and kind treatment. Afterward the grantor filed his bill against the son, for the reconveyance of the property: *Held,* that the conveyance was fraudulent, and that the grantor could not maintain the bill.

4. SAME—*who may avail of the fraudulent character of a conveyance—as to the grantee, or a trustee.* It is competent to go behind the language of a writing, and show that the real purpose of its execution is to delay and defraud creditors, in violation of the Statute of Frauds,—and this in behalf of the party ostensibly bound by the instrument, and to defeat a suit for its enforcement.

5.· Although a transfer of property by a father to his son contains nothing on its face to show an intention to defraud others, it is competent for the grantee, on bill by the grantor for a reconveyance, to show that the transfer and conveyance were in fact made to prevent the grantor's wife from obtaining separate maintenance and support from his property, and that the papers declaring the trust were executed secretly, and knowledge thereof withheld from the public, to enable the grantor to re-assert his ownership of the property after having accomplished the purpose of the transfer.

6. A trustee, however, into whose hands money is paid on account of a third person, can not set up the illegality of the trust under which the money was so paid, though the *cestui que trust* could not have enforced his right against the payer directly, as in that case he could only have obtained the money through the illegal agreement.

7. SAME—*secret trust—how created.* The question of the secrecy or publicity of the trust in the transfer of property with intent to defraud creditors, is not affected by the circumstance whether it was created by an oral declaration, only, or by a writing. That affects simply the question of proof. A trust created by a merely verbal expression of it, may yet be public, and a trust, though expressed in writing, may be secret, if the fraudulent grantee, without the knowledge of any one other than the fraudulent grantor, executes a writing declaring the trust, and gives it to the latter, who keeps it secretly in his own possession.

8. SAME—*subsequent agreement to create a trust—of its validity.* In the case of a fraudulent conveyance or assignment, it is competent for the parties thereto to subsequently make a new and independent agreement for a sufficient valuable consideration, whereby the grantee or assignee shall be obligated to hold the property in trust for the grantor or assignor; but such agreement must be open and notorious, and made in good faith to establish a trust in the property, otherwise it will be but attempting to create anew a secret trust already condemned by the statute.

9. CONTRACT—*consideration—resulting from an illegal agreement.* Where an act, though the result of an unlawful contract, is itself lawful, it may form the consideration for a lawful agreement, as, for instance, the actual transfer of stock, the agreement to do which was illegal.

10. PRIVILEGED COMMUNICATIONS—*to an attorney.* The statements of a fraudulent grantor, made to the attorney of the grantee, in respect to the purpose of the former in making the conveyances and assignments of his property, are not privileged, as against such grantor, but may be proved by the grantee in a suit by the grantor against the grantee for a reconveyance.

11. PRACTICE IN THE SUPREME COURT—*as to parties not appealing.* Where only one of several parties appeals from the decree of the trial

court to the Appellate Court, where the case is heard, and afterwards brought to this court, it was *held*, that this court could not pass upon the rights of the parties not appealing, and could only consider the case as it was before the Appellate Court.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

In May, 1885, William A. Tyler was married to a second wife. He then resided in Broome county, New York, and owned real estate in that county, and notes, bonds and mortgages, of the value of $100,000, or more. John B. Tyler was the son of William A. Tyler, by his first wife, and at that time resided at Conneaut, Ohio. This second marriage was infelicitous, and a separation followed within a few months. William A. Tyler then gave notice, by publication, that he would pay no debts thereafter contracted by his wife, and she, some time thereafter, commenced proceedings in the proper court, in Broome county, New York, for a decree for separate maintenance. Before the commencement of these proceedings, and in anticipation thereof, on or about the 27th of August, 1885, William A. Tyler went to Conneaut, Ohio, and then assigned and delivered to his said son, John B. Tyler, the principal part of his notes, bonds, mortgages, etc. This assignment was evidenced by writing, signed by both parties, containing a detailed description of the notes, bonds, mortgages, etc., assigned, and it concluded as follows: "And it is further agreed upon the part of said John B. Tyler, that he will pay to the said William A. Tyler, for and during the term of the natural life of him, the said William A. Tyler, the sum of five thousand (5000) dollars per annum, to be paid semi-annually, in sums of two thousand and five hundred (2500), from and after this date. Said payment, however, is to be made by the said John B. Tyler only upon the consideration that the sum is necessary for the support of him, the said William A. Tyler;

and said William A. Tyler shall have full right to demand said sum, or any part thereof, and he shall be the judge of his necessities in this respect, and he, said John B., when the same is demanded, shall not refuse to pay upon the ground that such sum is not necessary for support." The consideration expressed, in addition to this undertaking of John B., is $10,000.

In the afternoon of the same day, the following additional writing was executed and delivered by John B., at the request of William A.:

"CONNEAUT, O., *Aug. 27, 1885.*

"I, John B. Tyler, hereby agree, whenever demand is made by William A. Tyler, to surrender back to him certain personal property heretofore transferred to me, amounting to about $80,100, by him, said William A. Tyler, together with the interest due upon the securities, and for which I bind myself and my heirs for the above amount, and the said accumulated interest.                  JOHN B. TYLER."

It is claimed by William A., that the consideration of $10,000, expressed as the consideration for the assignment, in the writing first executed, was paid by the note of John B. for $5000, and certain drafts for $5000, delivered by John B. to him, and that upon the execution and delivery of this last writing to him by John B., and as the consideration thereof, he returned to John B. his promissory note for the $5000 and the drafts for the other $5000.

William A. at this time owned an undivided half of two farms in Broome county, New York, designated as the "Whitney's Point" and "Jacob Slack" farms, and on the 9th day of September, 1885, he conveyed his interest in them to Henry A. Sheldon, for $6500. On the 11th day of September, 1885, Sheldon conveyed his interest in these farms to John B. Tyler, for an advance of $100 on the price he paid. The money was furnished John B. by William A., and at the time of the

transaction John B. executed and delivered to William A. the following:

"BINGHAMTON, N. Y., *Sept. 11, 1885.*

"I have received the value of lands this day deeded to me by Henry A. Sheldon and wife, of William A. Tyler, and I bind myself, heirs and assigns, to give as good a title, on demand, as I have received, for value received.

J. B. TYLER."

About the same time, under the advice of counsel, William A. executed a more formal assignment of certain mortgage interests to John B., which need not be set out.

The bill for maintenance was filed by the wife of William A. on the 6th of October, 1885. At that time John B. was residing in Chicago, and William A. had been residing with him. William A. returned to Binghamton after the filing of the bill for maintenance, and was there personally served with process. On the 29th of December, 1885, an order was made in the maintenance suit, that William A. pay to his wife $12.50 per week from October 17, 1885, and $300 for costs of suit.

In January or February, 1886, William A. executed and delivered the following instrument to John B., which he dated back to a time anterior to the filing of the bill for maintenance:

"CHICAGO, *Sept. 30, 1885.*

"In consideration of having bed and board furnished me in the family of J. B. Tyler (my son) during the balance of my natural life, I hereby release from operation a certain proviso or annuity of $5000 per year, mentioned in an assignment made at Conneaut, Ohio, and bearing date of August 27, 1885. *Provided, however,* that said bed and board shall be substantially the same as that of the rest of said family, and also that kindness is extended to me by each and every member of said family.

"Any violation of the above proviso shall terminate and end the life of this instrument, at my option; and upon notice of

34—126 ILL.

same, then the annuity heretofore mentioned shall commence and be in operation the same as it was before the birth of this instrument. And this instrument also includes clothing and doctor bills. (Signed.) WILLIAM A. TYLER."

William A. Tyler filed his bill in the Superior Court of Cook county, against John B. Tyler, omitting any mention of his second marriage, alleging the execution of the instruments hereinbefore recited; that he had become aged and infirm, and was in bad health and in mental distress, and about to travel, and that the assignments were made merely for his convenience, and to enable John B. Tyler to act as his agent, and assist him in transacting his business, etc.; that it was agreed between him and John B., that the assignment should not take effect as long as William A. was able to manage his business and affairs; that he continued able to manage his business and affairs, and said assignment was treated as of no force; that John B. never paid any part of the annuity; that upon the advice of John B., and upon said original agreement that he would, upon request, re-assign said notes and securities to William A., and for the purpose of enabling John B. to aid William A. in the collection of interest, etc., and for the purpose of enabling John B. to aid William A. in re-investing the principal, William A. permitted the securities to remain in the name of John B., and re-invested some of the principal and interest collected on said securities, in the name of John B., and that all the money for which said notes and other securities were given, belonged to William A.

An amendment was made to the bill, during the trial, alleging that "some time during the month of March, 1886, said defendant executed and delivered to your orator a written statement, whereby he, said defendant, declared and stated that all of said securities and properties herein described as standing in his name, and claimed to belong to your orator, including said annuity of $100, were held by said defendant

in trust for your orator, but the precise terms of said written statement your orator can not set forth, as the same is not now in the power, possession or control of your orator, and your orator is unable to produce the same."

The prayer of the bill is, that "defendant may be enjoined from collecting any money due or to become due upon said certificate of deposit and said note of said Clark, and from selling, assigning, conveying or in any manner incumbering said certificate of deposit and note, and from selling, mortgaging and incumbering the real estate above mentioned, and from any further interference in the management and control of said property; that said defendant may be decreed to reassign, transfer and convey to complainant said securities and land, and upon his failure to do so, that a master may be ordered to make the same, and for other relief."

The answer denied the execution of the written statement set up in the amendment; alleged the marriage of William A., the subsequent separation from his wife, and the institution and prosecution of the proceedings for separate maintenance, and alleged that the assignments, transfers, etc., set out in the bill, were made solely for the purpose of defrauding the wife of William A., and preventing her from obtaining maintenance and support from his property.

The Superior Court, on hearing, found and decreed as follows: "The court finds that the several assignments, transfers and indorsements of notes and securities and choses in action, and the several conveyances of real estate made by complainant to defendant, in the pleadings mentioned, were made and executed for the purpose of hindering and delaying the wife of complainant in enforcing any claim against him for maintenance, support or alimony, and that defendant had knowledge of said purpose; that the several notes, mortgages and other securities referred to in the amended bill, which are now in the possession of complainant or his solicitors, to-wit, the Caruthers note and mortgage and the Morton note and mort-

gage, were never delivered to defendant, but remained in the lawful possession of complainant or his solicitors; that the Woolsey note and mortgage, the Rawson note and mortgage, the Watson note and mortgage, and the Parsons note, were delivered to defendant, and by him delivered to complainant, and thereafter remained in the lawful possession of complainant or his solicitors; that said notes and mortgages of Rawson, Watson and Parsons were taken in renewal of and exchange for notes of the same makers, mentioned in the original assignment made by complainant to defendant, dated August 27, 1885, and that said Watson note and mortgage were purchased with money collected on securities, also mentioned and described in said assignment; that the three bonds and mortgages assigned by Tracy R. Morgan to defendant, were never delivered to defendant, but remain in the possession of complainant, but that complainant did, about the month of November, 1885, place the defendant in the possession of the real estate described in said mortgages, and known as the "Osborne Hollow farm;" that the original assignment by the Susquehanna Valley Bank, to complainant and Henry A. Sheldon, of the Beach House mortgage, has been and is in the possession of said Sheldon ever since the same was made, and that complainant executed an assignment thereof to defendant, dated January 20, 1886, which assignment is still in the possession of defendant; that the original assignment made by Abel Bennett to complainant, of $10,000 in the Dean College mortgage, was assigned, by indorsement thereon, by the complainant to the defendant, and in the month of January, 1886, delivered by complainant to defendant, and in the same month re-delivered by defendant to complainant, since which time it has remained and is in the possession of complainant, and that afterwards, in the same month, complainant made and delivered to defendant a formal assignment of the interest in said mortgage so assigned by said Bennett, and of the mortgage given by one Perry, as collateral security for the same,

which assignments are in the possession of defendant; that the notes, mortgages and other securities in the hands of Edward P. Kirby, to-wit, the notes of Christy & McDowell and Conkle, are indorsed, 'Pay to the order of J. B. Tyler.—Wm. A. Tyler,' were delivered to said defendant, and are now in the possession of said Kirby, as the agent and attorney of said defendant; and it is decreed that the bill and amended bill be dismissed, each party to pay his own costs."

On appeal to the Appellate Court for the First District this decree was reversed, and the cause was remanded to the Superior Court, with direction to that court to "enter a decree requiring the appellee" (in that court, John B. Tyler,) "to surrender, transfer and set over to appellant," (in that court, William A. Tyler,) "and to fully account to him for all securities referred to in said declaration of trust bearing date August 27, 1885; and also requiring said appellee" (in that court, John B. Tyler,) "to convey, by proper deed to appellant," (in that court, William A. Tyler,) "the legal title to the lands situated in the State of New York, and referred to in the declaration of trust dated September 11, 1885." The cause comes to this court by the appeal of John B. Tyler from that judgment.

Messrs. ROBERTS, HUTCHINSON & THOMAS, for the appellant:

He who comes into a court of equity must come with clean hands, and a court of equity will not interfere in behalf of a fraudulent grantor. *Miller* v. *Marckle*, 21 Ill. 152; *Dunaway* v. *Robertson*, 95 id. 419; *Smith* v. *Hubbs*, 10 Me. 71; *Bott* v. *Rogers*, 3 Paige, 154.

It is not necessary there should be any actual defrauding of creditors intended. - It is sufficient if there was an intention to place property beyond their reach for the time being. *Phelps* v. *Curtis*, 80 Ill. 110; *Nesbitt* v. *Digby*, 13 id. 387; *Fitzgerald* v. *Forristal*, 48 id. 228; *Ryan* v. *Ryan*, 97 id. 38;

*Jones* v. *Read*, 3 Dana, 540; *Eyre* v. *Eyre*, 19 N. J. Eq. 42; *Hershy* v. *Weiting*, 50 Pa. St. 344.

In case of a fraudulent conveyance, a subsequent oral agreement to convey to the grantor will not be enforced. *Haisam* v. *Barrett*, 115 Mass. 256; *Norris* v. *Norris*, 9 Dana, 318; 1 Pomeroy's Eq. Jur. sec. 401; 1 Bispham's Eq. p. 310, sec. 248; Bump on Fraud. Con. (3d ed.) 477, 478.

A wife, as to her right of support and maintenance or alimony, is as much within the statute as a creditor. Rev. Stat. chap. 59, sec. 3; *Draper* v. *Draper*, 68 Ill. 17; *Sapp* v. *Wightman*, 103 id. 150; *Faker* v. *Brown*, 2 Blackf. 295; *Feighy* v. *Feighy*, 7 Md. 537; *Sanburn* v. *Long*, 41 id. 84; *Bails* v. *Bails*, 1 Cold. 287; *Nix* v. *Nix*, 10 Heisk. 546; *Livermore* v. *Boutelle*, 11 Gray, 290; *Lonsdale's Estate*, 29 Pa. St. 413; *Evans* v. *Harris*, 12 Harr. 66; *Chase* v. *Chase*, 105 Mass. 385; *Boslaugh* v. *Boslaugh*, 68 Pa. St. 499; *Tanner* v. *Tanner*, 44 Ala. 453; Bump on Fraud. Con. 505.

Equity will not decree the performance of an agreement by the fraudulent grantee. 1 Pomeroy's Eq. Jur. 400; Bump on Fraud. Con. 447; Waterman on Specific Per. 340; Waite on Fraud. Con. 521; *Taylor* v. *Merrill*, 55 Ill. 61; *Tamm* v. *Lavalle*, 92 id. 267; *Walton* v. *Trustees*, 49 Miss. 569; *Frisby* v. *Ballance*, 4 Scam. 287; *Bowman* v. *Cunningham*, 78 Ill. 48.

Messrs. HUTCHINSON & LUFF, for the appellee:

The agreements to return the personal property and convey the real estate to the appellee, were declarations of trust. It is not necessary that the word "trust" or "trustee" should be used, to constitute the relation of trustee and *cestui que trust.* Hill on Trustees, *65; Perry on Trusts, secs. 82, 125; *Kingsbury* v. *Burnside*, 58 Ill. 310; *Crawford's Appeal*, 61 Pa. 52.

A trust may be proved by parol averments and declarations. Hill on Trustees, *55, 56; Perry on Trusts, sec. 86.

The evidence of the oral declarations of the parties establishes the relation of the trustee and *cestui que trust.* It was

not secret. It was not concealed from the public. It was openly declared by both father and son, and the property was openly treated as the property of the father.

The relationship of trustee and *cestui que trust* having been established by written agreements, and by oral declarations made by the trustee, he will not be permitted to plead fraud, to defeat his trust agreements. *Fast* v. *McPherson*, 98 Ill. 496; *Owen* v. *Owen*, 23 N. J. Eq. 60; *Ellison* v. *Ellison*, 6 Ves. Jr. 662; *Bunn* v. *Winthrop*, 1 Johns. Ch. 329; *Daves* v. *Otto*, 35 Beav. 208.

If there is no valid claim against the grantor, an agreement to reconvey may be enforced, although the transfer was made to defeat an anticipated suit against him. *Damon* v. *Damon*, 4 Ala. 521; *Boyd* v. *De la Montague*, 73 N. Y. 498; *Daves* v. *Otto*, 35 Beav. 208; *Symes* v. *Hughes*, L. R. 9 Eq. 475.

The claim of the wife of the appellee, if she has any against him, deserves no consideration by a court of equity in Illinois. Whatever the character of the assignment of August 27, 1885, the trust agreement "to surrender back" the property on demand, was a contract founded on sufficient consideration to entitle the appellee to recover. This agreement was acted upon, and subsequent agreements and contracts were in harmony with it, and expressly recognized the appellee as the beneficial owner of all the property. *Parker* v. *Tiffany*, 52 Ill. 286; *Songer* v. *Partridge*, 107 id. 529; *Matthews* v. *Bank*, 43 Me. 265.

When a debtor deposits personal property in the hands of another, as bailee, with a view fraudulently to protect it from his creditors, such bailee can not avail himself of the fraud to defeat an action brought against him by the debtor for the recovery of such property. *Gowen* v. *Gowen*, 30 Mo. 427; *Parker* v. *Tiffany*, 52 Ill. 286.

If the agreement "to surrender back" the personal property, and the agreement to convey the real estate, were not declarations of trust, then we contend that the complainant would

be required to perform the contracts, because there was ample consideration for the agreements, and the contracts were valid between the parties, and the defendant could not plead fraud to which he was a party, to defeat his own contracts, founded upon an expressed and valuable consideration. He would be estopped to deny the validity of his contracts by showing his own fraud. *Dyer* v. *Homer,* 22 Pick. 253; *Harvey* v. *Varney,* 98 Mass. 118; *Findley* v. *Cooley,* 1 Black, 262; *Nichols* v. *Patten,* 18 Me. 229.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The Appellate Court, in its opinion filed on reversing the decree of the Superior Court, concurred in the conclusion reached by the Superior Court, that the conveyances and assignments in controversy were conceived and executed by the present appellee, of his own motion, for the purpose of preventing his wife from obtaining maintenance and support from his property. We have carefully examined the evidence preserved in the record, and we have no doubt of the correctness of that conclusion. In our opinion, the allegations of the bill are unsupported by the evidence, and it might be sufficient to dismiss the bill for that reason, without considering any other. See *White* v. *Morrison,* 11 Ill. 361; *McKay* v. *Bissett,* 5 Gilm. 499; *Jackson* v. *Miner,* 101 Ill. 550; *Baldwin* v. *Campfield,* 4 Halst. Ch. 891. We shall, however, not rest our decision on that ground alone.

The fourth section of our statute of "Frauds and Perjuries" makes void every gift, grant, conveyance, assignment or transfer of or charge upon any estate, real or personal,   *   *   * made with the intent to disturb, delay, hinder or defraud creditors or other persons," etc. (Rev. Stat. 1874, chap. 59.) If the wife be not, technically, a "creditor," she surely comes within the language "other persons," and she is, obviously, as much injured by such a conveyance as any creditor can be.

The same or equivalent language has been held to apply to the wife, in the following cases : *Bails* v. *Bails,* 1 Cold. (Tenn.) 287; *Reynolds* v. *Vance,* 1 Heisk. (Tenn.) 344; *Killinger* v. *Reidenbauer,* 6 S. & R. 531; *Boslaugh* v. *Boslaugh,* 68 Pa. St. 499; *Brewer* v. *Connell,* 11 Humph. 500; *Jenny* v. *Jenny,* 24 Vt. 324; *Gilmore* v. *Hutchinson,* 120 Mass. 271; *Jiggits* v. *Jiggits,* 40 Miss. 714; *Green* v. *Adams,* 59 Vt. 602; *Johnson* v. *Johnson,* 12 Ky. Court of App. 485. See, also, Bump on Fraudulent Conveyances, 515.

In *Draper* v. *Draper,* 68 Ill. 17, we held that a conveyance, after bill filed for divorce and alimony, with intent to deprive the wife of alimony, was fraudulent, and should be set aside; and this, by necessary inference, recognizes that the wife is within the contemplation of the statute.

The instrument executed on the morning of the 27th day of August, 1885, is, upon its face, plainly fraudulent, in that it attempts to secure the use of the property to appellee to the exclusion of all others,—whether creditors or others having claims upon him. *Power* v. *Alston,* 93 Ill. 587; *Annis* v. *Bonar,* 86 id. 128; *Truitt* v. *Griffin,* 61 id. 26; *Mitchell* v. *Sawyer et al.* 115 id. 650; *Moore* v. *Wood,* 93 id. 451. And the same is, in effect, the character of the instrument bearing date September 30, 1885.

But assuming that the several assignments and conveyances contain nothing, upon their faces, to condemn them, and that in the papers subsequently executed there is a trust declared in behalf of appellee, which, upon its face, discloses nothing to render it illegal, the question arises, is it competent for the defendant to show that the several assignments and conveyances were, in fact, made to prevent the wife of appellee from obtaining maintenance and support from his property, and that the papers declaring the trust were executed secretly, and knowledge thereof withheld from the public, to enable appellee to re-assert his ownership of the property after having accomplished the purpose of the assignments and conveyances.

It seems to be thought by counsel for appellee that *Fast et al.* v. *McPherson*, 98 Ill. 496, requires an answer in the negative. It is clear that such a view results from a misapprehension of the point actually in controversy in that case. It was there charged that Dexter had held the property in secret trust, in fraud of the creditors of Mrs. McPherson. But he had executed his trust by conveying the property, by the direction of the agent of Mrs. McPherson, to Fast, and Fast made a formal public declaration, in writing, that he held in trust. The principle applied is well sustained by authority. "Thus, where an act, though the result of an unlawful contract, is itself lawful, it may form the consideration for a lawful agreement, as, for instance, the actual transfer of stock, the agreement to do which was illegal. Similarly, a trustee into whose hands money is paid on account of a third person, can not set up the illegality of the trust under which the money was so paid, though the *cestui que trust* could not have enforced his right against the payer directly, as in that case he could only have got the money through the illegal agreement." Fry on Specific Performance, (2d Am. ed.) p. 215, sec. 313. See, also, ibid. *ante*, sec. 312.

This court, in *Miller* v. *Marckle,* 21 Ill. 152, committed itself to the doctrine that it is competent to go behind the language of a writing, and show that the real purpose of its execution is to hinder, delay and defraud creditors, in violation of the Statute of Frauds and Perjuries,—and this in behalf of the party ostensibly bound by the instrument, and to defeat a suit for its enforcement. The doctrine is re-asserted in *Ryan* v. *Ryan et al.* 97 Ill. 38, and indirectly recognized in *Dunaway* v. *Robertson et al.* 95 Ill. 419.

In *Nellis* v. *Clark,* 20 Wend. 24, and in *Smith* v. *Hubbs,* 1 Fairf. (Me.) 71, cited with approval and relied upon in *Miller* v. *Marckle* and *Dunaway* v. *Robertson et al.*, the point was raised, and insisted on in argument, that the defense that the instrument was executed in violation of the Statute of Frauds

and Perjuries, can only be allowed where the facts showing it must necessarily make a part of the plaintiff's or complainant's proof; but it was disallowed, and expressly ruled otherwise.

We concede that the ruling in some States is different from that in this court in the cases to which we have referred; but our cases are not without authority or reason, and the question must be regarded to be settled, here, as they declare. In addition to the cases cited in *Miller* v. *Marckle,* the following may be referred to as sustaining like views: *Walton* v. *Tursten,* 49 Miss. 569; *Chapin* v. *Rease,* 10 Conn. 69; *Murphy* v. *Hubert,* 16 Pa. St. 50; *Schenck* v. *Hart,* 32 N. J. Eq. 774; *Goudy* v. *Gebhart,* 1 Ohio St. 262; *McQuade* v. *Rosencranz,* 36 id. 442; *Inhabitants of Canton* v. *Inhabitants of Dorchester,* 8 Cush. 525.

It is argued that the fact that a declaration of trust is in writing, prevents its being secret. If, as we have before herein intimated, the purpose of this trust, as disclosed by the instruments relied upon as proving it, is, upon its face, to reserve the use of the property to appellee while placing it beyond the reach of others having a legal right, apart from such transfer, to resort to it, this is not important. But we do not think the question of the secrecy or the publicity of the trust is affected by the circumstance of whether it was created by word of mouth, only, or by writing. That affects simply the question of proof. If the trust affect lands, it must be in writing. (Rev. Stat. 1874, chap. 59, sec. 9.) But, manifestly, a trust may be public, and yet be created by word of mouth, only. Coke says, in *Twyne's case:* "And therefore, reader, when any gift shall be to you in satisfaction of a debt, by one who is indebted to others also: 1. Let it be made in a public manner, and before the neighbors, and not in private," etc. Had he understood that a writing would be conclusive of this question, he would undoubtedly have added, after the words "in private," "or let a memorandum thereof be made in writing," etc. And it is quite as manifest that a trust, though ex-

pressed in writing, may be secret, — as, if the fraudulent grantee or assignee, without the knowledge of, any one other than the fraudulent grantor or assignor, execute a writing declaring the trust, and hand it to the fraudulent grantor or assignor, and he thereafter keep it secretly in his own possession. The writing may be as effectually hid from the world at large, as is the memory of the fact not reduced to writing. The writings here relied upon were not placed upon record. They were retained in the pocket-book of appellee, and they were completely secreted from all but him and appellant,— and so the trust they declare is a secret trust.

We are not unmindful, in this connection, that it is competent, in the case of a fraudulent conveyance or assignment, for the parties thereto to subsequently make a new and independent agreement, for a sufficient valuable consideration, whereby the grantee or assignee shall be obligated to hold the property in trust for the grantor or assignor, as held in *Parker* v. *Tiffany*, 52 Ill. 286, and *Songer* v. *Partridge*, 107 id. 529. (See, also, Roberts on Fraud. Con. p. 495, sec. 10.) But it is manifest such agreement must be open and notorious, and made in good faith, to establish a trust in the property, for otherwise it would be but attempting to create anew a secret trust, already condemned by the statute.

What is here relied upon as a new agreement creating a trust between these parties, is an agreement of which the public knew nothing, which the appellee kept concealed in his pocket-book, and which he was under no obligation to observe unless he chose to do so, and which he himself wholly ignored and disregarded in the instrument he executed in January or February following, and dated September 30, 1885. If the first trust was secret, this one was clearly so. Not only was knowledge of it kept from the public, but it does not appear that any right was attempted to be asserted by virtue of it. In truth, we have the impression, from a careful reading of the evidence, that the execution of these several papers was

but an effort to guard against dangers suggested by new fears that appellee's wife might reach his property, as excited from time to time. Appellee seems to have been a passive instrument all the time, and, when acting at all, acting only and strictly in obedience to appellant.

An objection is urged that the Superior Court erred in permitting Cox, an attorney at law, to testify to what appellee said to him in respect to his purpose in making the assignments, conveyances, etc., to appellant. The objection is not tenable. No matter of confidence, as between appellee and Cox, was testified to. Cox was the attorney of appellant, not of appellee; and, at most, the case is not different from *Lynn* v. *Lyerle,* 113 Ill. 128, where it was held, that if two parties go together to an attorney, and make statements to him in the presence of each other, they are not confidential communications and therefore privileged.

The contention that the court erred in not requiring the parties to interplead on the petition of Hutchinson & Luff, is not tenable. Hutchinson & Luff,—the parties injured, if any, by that ruling,—are not before us. They neither appealed nor sued out a writ of error. We can only consider the case as it was before the Appellate Court.

The judgment of the Appellate Court is reversed, and the decree of the Superior Court is affirmed. Appellant will recover his costs in the Appellate Court as well as in this court, to be taxed on the certificate of the clerk of the Appellate Court.

*Judgment reversed.*