# SUPREME COURT,
## STATE OF KANSAS.

# JULY TERM, 1895.

PRESENT:

Hon. DAVID MARTIN, Chief Justice.
Hon. WILLIAM A. JOHNSTON, } Associate Justices.
Hon. STEPHEN H. ALLEN,

Eli D. Small *et al.* v. Rebecca Small.

No. 7642.

Gifts of Husband, *not in Fraud of Wife.* Subject to certain limitations not applicable to this case, and as against any *post-mortem* claim of his widow, a married man, in Illinois or in Kansas, may, during coverture, give away to his children absolutely the bulk of his property, when the known effect of the gift will be to deprive the widow of the fair share of the property which otherwise would have fallen to her.

*Error from Jackson District Court.*

On January 27, 1859, at Findlay, Ohio, Daniel Small married Rebecca Cone, the present defendant in error, as Rebecca Small. He was the father of five children by a former marriage, namely, Eli D., Daniel J., John D., William B., and Susan, now Susan Mc-Kenney; the oldest, Eli D., being about 17, and the youngest, the daughter, about 3½ years of age; and his home was at Wilmington, Will county, Illinois. He had accumulated about $30,000, but Rebecca

1—56 KAS.

Cone's belongings were of trifling value. She went from Findlay to Wilmington, and took charge of the children, who soon became very much attached to her, and she was devoted to their welfare, and the relations of the entire family were always very harmonious up to the death of Daniel Small, which occurred April 14, 1888. The business of Daniel Small was the loaning of money on his own account. As early as 1869, Daniel Small conceived the idea of giving or leaving the bulk of his fortune to his said five children, in equal shares (there being no issue of his second marriage), after providing a sum sufficient for the maintenance of his wife during her widowhood, but nothing in that direction was done until March 19, 1878, when he made an assignment of all the notes, bonds, mortgages and securities held by him on or against persons or property in Illinois, and amounting to about $100,000, to his brother, Darius Small, of Herkimer county, New York, in trust for said five children, the trustee being authorized to collect the notes and securities and reinvest the proceeds in other interest-bearing securities or real estate in or outside of the state, and to divide the same, with the accumulations at his death, in equal shares, among said children. By the terms of this trust assignment, Darius Small was authorized to appoint some discreet person, a resident of Will county, as his attorney in fact, to assist in carrying out the trust, and on the same day Darius Small accepted the trust, and also appointed Eli D. Small as such attorney in fact. Daniel Small had all these notes and securities in a safe. He took them out and handed them to Darius Small, who in turn delivered them to Eli D. Small, and he put them back in the safe in the same condition as before. Darius Small was on a visit to his

brother at the time, and in a few days afterward he returned to New York, and never had anything more to do with the trust, except that on January 22, 1879, he executed a further power of attorney to Eli D. Small, authorizing him to sell and convey any real estate situated in Kansas or elsewhere, the title to which might be vested in him as such trustee. Daniel Small continued managing the investments as before, but Eli D. Small assisted him. Most of the notes secured by mortgages on real estate were taken in the name of Darius Small, trustee, and on payment of the same it was the custom for Eli D. Small to satisfy the mortgages as attorney in fact; but the loans made on personal security were principally in the name of Daniel Small.

In 1879, and subsequently, part of what was called the trust fund was invested in two ranches, (one of them consisting of between 3,000 and 4,000 acres in Jackson and Shawnee counties, Kansas, and another one of more than 1,000 acres in Wabaunsee county, Kansas,) and in improving the same, and the title to these lands was taken in the name of Darius Small, trustee of Daniel Small, but Darius Small knew nothing of the transaction, and the lands were selected by Daniel Small, Eli D. Small, and the other sons. Part of the fund was also loaned through the American Bank, in North Topeka, established by the sons. They, or some of them, resided upon the ranches, and the funds for their improvement were furnished in a large measure through the bank. In July, 1886, Daniel Small executed a quitclaim deed to his four sons and his daughter for said Kansas lands, and shortly afterward Eli D. Small, as attorney in fact for Darius Small, executed deeds to Daniel Small and John D. Small for the large ranch in Jackson and Shawnee

counties, and a deed to William B. Small for the smaller ranch in Wabaunsee county. About the same time, Susan McKenney quitclaimed her interest in the land to her brothers, and John D. Small and Daniel J. Small conveyed a one-third interest in the large ranch to Eli D. Small. The sons executed a promissory note to their sister for $8,740.25, an amount equal to one-fifth of the money invested in the lands and the improvements. Rebecca Small did not join in the conveyance with her husband, and she knew nothing about it at the time, but was informed of the transfer to the sons some time in the autumn of 1886. She never resided in Kansas, but had been on visits with her husband to the sons, and knew that they occupied the lands. For several years prior to September 12, 1882, Daniel Small had loaned or advanced money in unequal amounts to his sons, and on or about that day he paid them the residue of what would make $20,000 each, and he charged the same on his book as advancements. At the same time he had each of his sons to sign a paper, agreeing that in the final division their sister, Susan, should have an equal one-fifth share with them, including said advancements. Susan was then married to W. J. McKenney, of Brooklyn, N. Y., and her father afterward advanced to her the sum of $15,500, which was principally used in the purchase of a home in Brooklyn. Rebecca Small knew that money was furnished to Susan for the purchase of a home, but she did not know of the advancements to the sons, and was not consulted in reference thereto. About January, 1888, Daniel Small was taken sick, and his son Daniel J. Small went from Kansas to Wilmington, and remained there until October, 1888. Susan McKenney was also there for some weeks before and after her father's

death. When Daniel Small realized that he could not live much longer, he told his son Daniel J. to go to Judge Parks, a lawyer at Joliet who was familiar with his affairs, and to tell him that if the trust arrangement of 1878 was not iron-clad, he wanted it made so, as he desired to leave $20,000 as a fund for the support of his widow, and that all the rest of his personal property should go in equal shares to his children, including the $20,000, the income only of which should be used for the support of his widow. Judge Parks suggested that he thought this could not be accomplished by will without the consent of Rebecca Small, but that all the notes and securities might be given away absolutely to the children in his lifetime, the remainder of the property to be disposed of by will; and he accordingly drew up two papers, one being in form a will, and the body of the other instrument reading as follows :

"Conscious that I am now suffering from a malady likely to prove fatal, and deeming it expedient to make final distribution and disposition of my personal estate (save what I propose to set apart for the benefit of my wife) in my lifetime, I have determined to carry out my long and well-considered purpose by an immediate transfer and delivery of the same, consisting for the most part of securities, to my son Daniel J. Small, who is now with me, in trust, to divide equally amongst my five children, Daniel J., Eli D., John D., William B., and Susan McKenney, share and share alike.

"In execution whereof, in consideration of love and affection, I do hereby assign, transfer, and set over to said Daniel J. Small, in trust as aforesaid, all my right, title and interest in and to the notes, mortgages and securities mentioned and described in the schedule hereto subjoined, to have and to hold to him and his personal representatives for the purpose above set forth."

The will, as drawn, recites that the testator had already, by advancements and recent gifts to his children, disposed of all his personal estate except about $20,000, and that, being desirous of making a reasonable and adequate provision for the support of his wife, Rebecca Small, by whom he had no children, he did give and bequeath to his executor $20,000 as a fund to invest and reinvest in good interest-bearing securities, at his discretion, and from the interest received therefrom to pay her the annual sum of $1,200 in such periodical installments as he might see fit during her natural life, and upon her death to divide said fund amongst said five children, share and share alike ; said provision for the widow to be in lieu and discharge of all her rights of dower, save in his real estate, which, together with his household furniture and such articles of personal property as he had not in the will or otherwise disposed of, he left to the disposition of the law, Daniel J. Small being named as sole executor and trustee.   On these papers being exhibited to Daniel Small, he directed that the will be changed so that the payments to Rebecca Small should continue only while she remained his widow, and in the event of her death or marriage the fund to be divided among the five children.   The will was changed according to his desire, and a schedule of the notes, securities, etc., amounting to a little more than $100,-000, having been made, was attached to the instrument of gift, and the notes and securities were delivered to Daniel J. Small, he having received written authority from his brothers and his sister to receive in their name and behalf any gift which their father might desire to make.   The will and the instrument of gift were executed on March 26, 1888, and Daniel J. Small retained possession of said notes and securities until

his father's death and afterward, as also the $20,000 additional selected for the widow. The will was admitted to probate in Will county, Illinois, April 21, 1888.

Rebecca Small did not know of said trust arrangement of March 19, 1878, until after this action was commenced, the children having been requested by Daniel Small not to mention it to her, or in her presence; she did not know of the advancements of $20,000 each to the sons for a like reason, and she was kept in entire ignorance of the gift instrument and the will of March 26, 1888, until shortly before the will was probated. She knew that her husband had a large amount of money and property, but she was told by Daniel J. Small and Judge Parks, before the probate of the will, that Daniel Small had given substantially everything away except the $20,000 left for her support by the will. It does not appear that she made any inquiry as to the particular disposition of the property, although she was much dissatisfied with the provision made for her. She obtained a certified copy of the will in October, 1888, and then consulted an attorney as to her rights. On May 9, 1888, she entered into a written agreement with all the children wherein they agreed that she should have $1,400 a year, payable in monthly installments, in consideration of concessions made by her in relation to certain real and personal property, which under the will would become as intestate property, this being allowable under the laws of Illinois. Daniel J. Small paid and Rebecca Small received the monthly installments required by said contract from its date until very shortly before this action was commenced, when she, through her attorneys, tendered back to

Daniel J. Small the amount received and interest thereon.

Under the law of descents in Illinois, where a husband dies intestate, leaving surviving him a widow and children, the widow is entitled to one-third of the personal estate as her absolute property. Advancements to children and lineal descendants are considered as part of the estate, so far as it regards the division and distribution thereof among the issue, and are to be taken by the child or descendant toward his share of the estate, but he is not required to refund any part thereof, although it exceeds his share. Any provision made by will for the widow, if not otherwise expressed therein, bars her of dower in the lands of the deceased, unless such provision be renounced within one year, in which case she is entitled to dower in the lands, and to one-third of the personal estate after the payment of all debts; but Rebecca Small never made any renunciation.

On April 2, 1890, Rebecca Small commenced her action against Eli D. Small, John D. Small, William B. Small, Daniel J. Small, and Daniel J. Small as executor of the last will and testament of Daniel Small, deceased, for the cancellation of the several instruments referred to, except the trust agreement of March 19, 1878, (of which she was ignorant,) and for an accounting as to all property received by the defendants from Daniel Small or his estate, praying that she be adjudged the owner of an undivided half of all said lands in Kansas, asking also for her share of the rents and profits thereof, and her share of the rents and profits of certain real estate in Illinois, and for decree of partition of the Kansas lands. The case was tried at November term, 1890. The court held

that the plaintiff below could not recover any part of the Kansas lands, but that all the transactions were fraudulent as to her, and as to any interest she might have had in the estate of her husband upon his death the latter is to be held as having died intestate, and rendered money judgments against the defendants below aggregating $72,809.78.

The defendants below prosecute their petition as plaintiffs in error in this court, and a cross-petition in error has also been filed by Rebecca Small.

*Douthitt, Jones & Mason*, for plaintiffs in error; *Waggener, Horton & Orr*, of counsel.

*Valentine, Godard & Valentine*, *A. D. Walker*, and *Hayden & Hayden*, for defendant in error.

The opinion of the court was delivered by

MARTIN, C. J.: Many questions respecting rights as well as remedies have been presented, and very ably argued orally and in the voluminous briefs of counsel, but we have found it necessary to decide only one of them. The underlying question is whether, under the laws of Illinois or of Kansas, the several gifts and advancements made by Daniel Small to his children are to be treated as fraudulent and void as to his widow. Most of these gifts and advancements were made without the knowledge of Rebecca Small, and Daniel Small appears to have enjoined upon his children that the subject should not be mentioned to her, nor in her presence. Secrecy is often called a badge of fraud, but it is not fraud itself. If a man's disposition of his property is fair and lawful, the concealment of the transaction cannot render it fraudulent. If the rights of the children were dependent only upon the trust agreement of March 19, 1878, it

is doubtful if they could stand the test of law and equity, for, notwithstanding the trust appeared upon its face to be a valid disposition of the property and securities therein mentioned, such as would be binding upon Daniel Small, yet the trusteeship of Darius Small seems to have been only nominal, and Daniel Small virtually controlled the property, and did as he pleased respecting it, just as he had done before ; his son, Eli D. Small, the nominal attorney in fact of the trustee, merely assisting in the transaction of the business of collecting and reinvesting.    If Daniel Small had .died while the securities were in this condition and the Kansas lands in the name of Darius Small as trustee, probably it should be said that all belonged in equity to Daniel Small and formed part of his estate upon his death ; but a considerable portion of the so-called trust fund was invested in the Kansas lands and improvements thereon, and both Daniel Small and the trustee, through his attorney in fact, conveyed the lands to the sons and the daughter absolutely in 1886. The advancements were made in 1882, and prior thereto, and we suppose they formed part of said trust fund and its accumulations, and 19 days before the death of Daniel Small he made the final gift, exceeding $100,000.    On April 1, 1888, two weeks before his death, Daniel Small had no control in law or equity of the money advancements, the Kansas lands, nor the notes, securities, etc., which were the subject of the gift of March 26, 1888.    All were valid dispositions as to him, and he could not have recovered a dollar thereof from his children.    Upon his death they therefore formed no part of his estate, unless upon some established principle of law or equity his widow had a right to so consider them.    And this brings us to the main question in the case, namely, under the laws of Illinois

and of this state may a married man during coverture, as against any *post-mortem* claim of the widow, give away to his children the bulk of his property when the known effect of so doing is to diminish the share which she would have been otherwise entitled to upon his death? In this state there are some limitations upon the right of disposition of real property by a husband where the wife is a resident of this state; but section 8 of our act concerning descents and distributions (Gen. Stat. 1889, ¶ 2599), which allows to the widow one-half in value of all the real estate in which the husband at any time during the marriage had a legal or equitable interest, not sold at judicial sale, and not necessary for the payment of debts, and to which the wife has made no conveyance, provides further, that the wife shall not be entitled to any interest under said section in any lands to which the husband has made a conveyance, when the wife at the time of the conveyance is not, and never has been, a resident of this state; and in *Buffington v. Grosvenor*, 46 Kan. 730, it was held that this proviso is constitutional. Under this decision Rebecca Small is cut off from any claim of right, title or interest in the Kansas lands, and the court below was correct in so holding.

The advancements of money and the gifts of notes and securities of March 26, 1888, were made in Illinois, and, if lawful there, we should probably so consider them here, even though invalid if made in this state; and this leads us to a consideration of the laws of Illinois applicable to this subject. The controversy constituting the subject-matter of the cases of *Padfield v. Padfield* in its several aspects was three times before the supreme court of Illinois, and received very full consideration. (68 Ill. 210; 72 id. 322; and 78 id. 16.) It was finally held in the last suit, which was brought

by the widow, that any disposition of personal property and credits by a husband in good faith, where no right or interest is reserved to him either present or ultimate, though made to defeat the rights of his wife, will be good against her; and that there is nothing in the statute respecting the estates of deceased persons that in the slightest degree prevents the husband from disposing of his personal property free from any claim of his wife, whether by sale, gift to his children, or otherwise, in his lifetime. The court quotes approvingly from a note in Kerr on Frauds and Mistakes, 220, as follows :

"There can be no doubt of the power of a husband to dispose absolutely of his property during his life, independently of the concurrence and exonerated from the claim of his wife, provided the transaction is not merely colorable, and be unattended with circumstances indicative of fraud upon the rights of the wife. If the disposition of the husband be *bona fide*, and no right is reserved to him, though made to defeat the right of the wife, it will be good against her."

And the court refers to *Dunnock v. Dunnock*, 3 Md. Ch. 140; *Cameron v. Cameron*, 10 Smedes & Mar. 394; *Lightfoot v. Colgin*, 5 Munf. 42; *Stewart v. Stewart*, 5 Conn. 317; and *Holmes v. Holmes*, 3 Paige, 363, as fully supporting the doctrine. The court further says :

"Again, the act of 1861, known as the 'Married Woman's Law,' confers upon *femes covert* the power of disposing of their separate property, absolutely and as they may choose, free from the control of their husbands. It was manifestly the intention of the general assembly to confer on married women the same and no greater rights, in regard to their property, as were possessed by their husbands. It would be singular, and we cannot suppose that the legislature could have intended to confer other or greater power on the wife than upon the husband. To

hold that a *feme covert* has a vested interest in her
husband's personal estate, that he is unable to divest
in his lifetime, would be disastrous in the extreme to
trade and commerce. Owing to commercial necessi-
ties, personalty must be left free for exchange, and,
to be so, some one must be vested with full power to
sell and transfer it free from latent and contingent
claims.''

It is contended by counsel for Rebecca Small that
section 4 of the Illinois statute of frauds was amended
in 1874, after the rights in the Padfield cases had
vested, so that gifts made with intent to defraud
'' creditors or other persons'' ( the last three words
having been added ) were declared void, and that a
widow comes within the designation of '' other per-
sons,'' and therefore the doctrine in the last Padfield
case is changed by statute, and that this is recognized
in *Tyler v. Tyler*, 126 Ill. 525. In that case it appears
that William A. Tyler, in anticipation of proceedings
by his wife against him for separate maintenance in
Broome county, New York, went to Conneaut, Ohio,
and assigned and delivered to his son, John B. Tyler,
a large amount of notes, bonds, and mortgages, and
also indirectly transferred to him certain lands. The
suit was brought by the wife soon after the transfer.
Afterward, William A. Tyler commenced an action in
Illinois against his son to compel a reassignment of
said notes, bonds, and mortgages, and a reconveyance
of the lands ; but it was held by the supreme court of
Illinois that the action could not be maintained, said
William A. Tyler having transferred the property with
intent to defraud the wife, and to render any judgment
for separate maintenance ineffectual, the wife coming
within the designation of '' other persons'' in said
section 4 of the statute of frauds as amended. The
Padfield cases are not overruled, distinguished, nor

otherwise referred to, but the case follows *Draper v. Draper*, 68 Ill. 17, where it was held that a conveyance, after bill filed for divorce and alimony, with intent to deprive the wife of alimony, was fraudulent, and should be set aside. The phrase "other persons" probably would not include a widow seeking to enforce her rights under the statute of descents and distributions. When general words follow particular and specific words, the former must be confined to things of the same kind. (Suth. Stat. Const. §§ 268, 273, 277; *Guptil v. McFee*, 9 Kan. 30, 37; *White v. Ivey*, 34 Ga. 186, 199; *The State v. McGarry*, 21 Wis. 496, 498.) The word "creditors" serves to limit and control the generality of the following words "other persons" so as to include only those of like or similar kind and nature to creditors.

There seems to be a distinction between the rights of a widow and those of a wife driven by the aggressions of her husband to a suit for alimony or separate maintenance. In the latter case the wife is seeking to establish an unliquidated claim against her husband for money or property, and her relation to him is that of a *quasi* creditor. This dissimilarity is pointed out by Agnew, J., in *Bouslough v. Bouslough*, 68 Pa. St. 495, 499, as follows:

"So the rule that forbids the wife to avoid the voluntary assignment or gift of her husband, must change when her relation to him changes. There is no reason why a wife whose husband has deserted her, and refused to perform the duty of maintenance, or who, by cruel treatment, has compelled her to leave his house, and commence proceedings for divorce and maintenance, should not be viewed as a *quasi* creditor in relation to the alimony which the law awards to her. So long as she is receiving maintenance, and is under his wing, as it were, she is bound by his acts as to his personal estate; but when she is compelled

to become a suitor for her rights, her relation becomes adverse, and that of a creditor in fact, and she is not to be balked of her dues by his fraud.''

Recognizing this distinction, it would seem that Rebecca Small, while residing with her husband in the most amicable relations, could not have maintained an action to set aside or annul the advancements and gifts to the children, nor to compel either her husband or the children to account to her for the same; and, as these advancements and gifts were valid as to her and valid as to Daniel Small when made, they formed no part of the estate at his death. But we need not go so far in this case.

The reasoning in *Padfield v. Padfield*, supra, as to the "Married Woman's Law" in Illinois is of much force here. In some states property acquired during coverture is known as "community property," and partakes to some extent of the nature of partnership property between husband and wife; but our legislation is in the opposite direction, manifesting a purpose to maintain, as far as practicable, the separate rights of husband and wife as well to accumulations during as before the existence of the marriage relation, and each is entitled to dispose of his or her own goods and chattels, with a slight modification as to mortgaging the same. Some of our former decisions have accorded in spirit with the doctrine established in Illinois. (*Butler v. Butler*, 21 Kan. 521, 525, 526; *Munger v. Baldridge*, 41 id. 241–244.) The cases of *Busenbark v. Busenbark*, 33 Kan. 572, and *Green v. Green*, 34 id. 740, both relate to protection of the husband and wife, respectively, during coverture from fraudulent alienation of real estate by the other, and are only remotely analogous to the case now under consideration.

In *Williams v. Williams*, in the circuit court of the United States for the district of Kansas, (40 Fed. Rep. 521,) Foster, J., delivering the opinion of the court, said:

"The main question, in its broadest sense, is simply this: Can a married man give away his property, during coverture, for the purpose of preventing his wife from acquiring an interest therein after his death? The law seems to be that, if such gift is *bona fide* and accompanied by delivery, the widow cannot reach the property after the donor's death. . . . Neither the wife nor children have any tangible interest in the property of the husband or father during his lifetime, except so far as he is liable for their support; and hence he can sell it or give it away without let or hindrance from them. Of course the sale or gift must be absolute and *bona fide*, and not colorable only. And if the sale or gift would bind the grantor, it would bind his heirs."

We are aware that the authorities are not all in harmony upon this subject, but the cases asserting a contrary doctrine are generally under statutes or customs different from those of Illinois and Kansas; and we think the weight of authority in states having statutes upon this subject of the same general nature as our own establishes the doctrine herein announced. We cite some authorities in addition to those hereinbefore given, viz.: *Pringle v. Pringle*, 59 Pa. St. 281; *Lines v. Lines*, 142 id. 149; *Richards v. Richards*, 11 Humph. 429; *Sanborn v. Goodhue*, 8 Foster, 48; *Ford v. Ford*, 4 Ala. (N. S.) 142, 146; *Smith v. Hines*, 10 Fla. 258, 285; Stewart, Husb. & Wife, § 301; Thornt. Gifts & Adv. § 488.

We are of opinion that the rights of Rebecca Small are controlled by the will and the contract of May 9, 1888. If there was any real estate or personal property in Illinois or elsewhere not disposed of by the will

nor included in the contract, of course she is entitled to her proper share of the same.

The judgment will be reversed, and the case remanded for further proceedings in accordance with this opinion.

All the Justices concurring.