# WILLIAM R. CHARLTON and MARTHA A. CHARLTON, Appellants, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY.

### Division One, December 22, 1906.

1. **ACTION: Accruing Elsewhere.** A cause of action accruing in Kansas, and growing out of an employment in that State and out of the laws thereof, is enforcible in the courts of this State.

2. **———: By Parents for Death of Son: Under Laws of Kansas: Next of Kin.** Under the laws of Kansas and a decision of the courts of that State construing the words "next of kin," found in the Kansas statute, to mean parents, the parents of a railroad brakeman of legal age may recover in a suit in this State for the negligent killing of their said son in that State by a railroad company of this State.

3. **NEGLIGENCE: Committed in Another State: Conflicting Decisions.** There is no substantial conflict between the decisions of this court and those of the Supreme Court of Kansas on the subjects of contributory negligence and assumed risks. And the laws of Kansas permitting parents to recover damages for the death of a person caused by the wrongful act or omission of another where the person himself could have recovered for his injuries had he survived them, this court in disposing of the contention that deceased assumed the risk of the injury which resulted in his death and was guilty of contributory negligence, will be guided by the doctrine of both courts.

4. **———: Assumption of Risk.** Negligence rests on tort; assumption of risk, on contract. The servant, when he enters his master's employ, impliedly agrees with him, for the compensation named, to assume the risk of unusual dangers incident to the work. But he does not assume the risk of the master's negligence, it being against public policy for a master to contract against his own negligence; on the contrary, the master impliedly contracts with the servant that he will exercise ordinary care to protect him from injury by providing a reasonably safe place for him to work. The only risks the servant assumes, therefore, are those which remain after the master has exercised ordinary care.

5. **———: ———: Knowledge of Servant: Water Crane: Brakeman.** Where there is no evidence that the brakeman who, while on a box car's ladder as it passed a water tank, was struck by a projecting rod supporting the water crane, knew how close

the water crane or rod was to the tank or had the means of knowledge that would be equivalent to knowledge, the court will not say that as a matter of law he should be held to know the distance of the crane and rod from the track and consequently the danger therefrom—freight trains not using that tank.

6. ————: ————: **Observation.** It is a matter of common knowledge that there is a radical difference among average people in the power of accurate observation.

7. ————: **Projecting Crane: Safe Distance from Track.** It will not be said as a matter of law that a space of eighteen and one-half inches or of twenty-three and one-half inches between the handholds or ladder of a box car and a projecting rod attached to the crane of a water tank used by passenger trains alone, was a safe distance, where a brakeman of a freight train, riding on the ladder, in the exercise of due care, in the master's business, in no unusual attitude, came in contact with the rod and was injured thereby. In such case the issue of defendant's negligence should be put to the jury.

8. ————: **Contributory: Brakeman: Mounting Train in Motion: Eating.** The leaving of the train by a brakeman to get a lunch, mounting it thereafter while it was in motion, and mounting it on one side of the water crane which injured him rather than on the other, are not as matters of law contributory negligence.

9. ————: ————: ————: ————: **To Observe Tramps.** Mounting a train by a brakeman to observe tramps trying to board the train, in the absence of proof that he was not in the line of his duty, will not be assumed to be contributory negligence.

10. ————: ————: **Affirmative Defense: Demurrer.** Contributory negligence is an affirmative defense in this State, in which defendant carries the burden of proof, though, of course, in a given case it may be made out on plaintiff's proof alone. But on demurrer plaintiff is entitled to the full force of his entire evidence, direct and inferential; and if, after giving to plaintiff every reasonable inference fairly deducible from the facts proved, it cannot be said as an irresistible conclusion of law therefrom that he was guilty of contributory negligence, the demurrer should be overruled, if there is substantial evidence going to show that defendant's negligence was the proximate cause of plaintiff's injuries.

11. ————: **Evidence: Connecting Conversations.** Particulars of a conversation between a witness and the injured party killed by the accident occurring just prior thereto, are not competent; but the fact that a conversation was held and the identification of its subject-matter, where the conversation had a

connected or rational relation with the happenings, are competent.

12. ———: ———: **Like Incident.** Plaintiffs' son, a brakeman, being killed by his body coming in contact with the crane of a water tank, as the car on whose ladder he was riding went by, it was competent for a witness for them to testify that he had been a brakeman on defendant's road and was familiar with the crane and that it brushed his arm once in passing. That testimony tended to show the nearness of the crane to the tank and its dangers. Whether or not the witness assumed an unnatural or unusual position when brushed by the crane was a matter that might be developed on cross-examination.

13. ———: ———: **General Rule.** Evidence of accidents that have previously happened under the same conditions at a given spot from the same cause is competent.

14. ———: ———: **Keeping Trespassers Off Train.** The duties of a brakeman with reference to keeping trespassers off of cars may be shown by the oral testimony of another brakeman showing what brakemen usually do.

15. ———: ———: **Striking Out Whole Answer.** Because a witness puts in incompetent statements, put in as coloring matter or as a conclusion, such as, "I was a little afraid" of the crane which struck deceased, "it was a little too close to suit me," is no reason for striking out his entire answer, that part which is competent, such as that he had observed the distance of the crane from the track, as well as the incompetent conclusion.

16. ———: ———: **Use of Water Tanks at Another Place.** Evidence that all trains on defendant's track starting out of Kansas City took water through a crane much further from the track than was the one in the small town by which deceased was struck in passing, at which freight trains did not take water, was competent proof—the evidence showing that defendant was a brakeman on a train running out of Kansas City.

17. ———: ———: **Width of Cars: Best Evidence.** In the absence of knowledge of the indentical car doing the injury and of its width, and of its projection over the rail, plaintiff is entitled to the next best evidence obtainable, and, hence, in a suit where deceased was killed by being struck by a rod supporting a crane to a water tank, as the car on whose ladder he was riding passed by, measurements made by a witness who was not a railroad man, of the width of defendant's cars at the place where the accident occurred, are competent evidence.

Appeal from Jackson Circuit Court.—*Hon. Andrew F. Evans*, Judge.

REVERSED AND REMANDED (*with directions*).

*Flournoy & Flournoy* for appellants.

(1) Respondent was guilty of negligence in placing and maintaining the water crane so near the track that it was dangerous to brakemen who in the performance of their duties might be upon the side ladders of box cars passing it. Railroad v. McDade, 191 U. S. 64; Railroad v. Michaelis, 57 Kan. 474; Railroad v. Thompson, 94 Ala. 636; Railroad v. Davis, 92 Ala. 300; Central Trust Co. v. Railroad, 73 Fed. 661; Wither v. Somerset Traction Co., 98 Me. 61; Railroad v. Mansell, 138 Ala. 548; Murphy v. Railroad, 115 Mo. 111; Railroad v. Thompson, 210 Ill. 226; Kellerher v. Railroad, 80 Wis. 584. (2) As the water crane in question was not so near the track as to be conspicuously dangerous, the deceased was not guilty of contributory negligence in assuming that it would not injure him and continuing to perform his duties. Neither did he assume the risk, as it was not incident to his employment, but the result of the negligence of his employer. Lee v. Railroad, 92 S. W. 614; Emporia v. Kowalski, 66 Kan. 64; Rouse v. Ledbitter, 56 Kan. 348; Minnier v. Railroad, 167 Mo. 99; Lawrence v. Heidbreder, 93 S. W. 897; Phippin v. Railroad, 93 S. W. 410; Curtis v. McNair, 173 Mo. 280. (3) It was error for the court to strike out the testimony of a witness that the crane in question had struck his arm as he was passing it on a car ladder. District of Columbia v. Armes, 107 U. S. 519; Golden v. City of Clinton, 54 Mo. App. 100; Campbell v. Railroad, 121 Mo. 340. (4) It was error for the court to refuse to permit appellants to show by witness Lane the projection over the track rail of certain box cars which he had measured at Paola, and to refuse to permit appellants to show by said witness the projection over the track rail of a standard box

car, because the negligence of respondent consisted in placing the crane so near the track as to endanger its brakemen, hence the extent of the projection over the track rail of all kinds of box cars was relevant. (5) It was error for the trial court to refuse to permit appellants to show that all freight trains on respondent's road going out of Kansas City took water at a crane like the one in question which was situated six feet from the nearest rail, because such evidence was relevant as bearing upon the question of the negligence of the deceased. (6) It was error for the trial court to refuse to permit appellants to show that it was customary for brakemen on freight trains to keep trespassers off the trains. That was the proper way to show that keeping trespassers off trains was one of the duties of a brakeman. No freight trains watered at the iron crane at Paola, hence the deceased would not probably have examined it as closely as he would the one where his trains did take water, and would naturally presume that the one at Paola was as far from the track as the one at Kansas City, which was six feet from the nearest rail.

*L. F. Parker* and *Pratt, Dana & Black* for respondent.

The court did not err in sustaining defendant's demurrer to the evidence. The deceased was guilty of contributory negligence, and the danger was one of the risks of the business in which he was engaged and was open and obvious. There was no proof of any negligence in the construction or location of the water crane. (1) Cases cited by appellants are not in point, and the facts easily distinguish them from the case at bar. The case of Murphy v. Railroad, 115 Mo. 111, is essentially different from the facts herein. The case was a close one and it was admitted that it was decided

upon the peculiar facts involved. That case is easily distinguished from the case at bar, because in this case there was no necessity for Charlton's exposing himself when he might have avoided danger. The case of Railroad v. Michaels, 57 Kan. 474, is not a similar case. (2) The weight of authority is against appellant's right to recover. Randall v. Railroad, 109 U. S. 479; Austin v. Railroad, 164 Mass. 282; Goodes v. Railroad, 162 Mass. 287; Scidmore v. Railroad, 89 Wis. 188; Jennings v. Railroad, 7 Wash. 275; Wilson v. Railroad, 85 Ala. 269; Railroad v. Finney, 145 Ind. 551; McKee v. Railroad, 83 Iowa 616; Brown v. Railroad, 69 Iowa 167; Platt v. Railroad, 84 Iowa 694. (3) Plaintiffs alleged negligence in their petition, but did not prove the same. They could not recover for that reason. Sisco v. Railroad, 145 N. Y. 296; Rains v. Railroad, 71 Mo. 164. (4) The danger of being struck by defendant's water crane on its platform at Paola, Kansas, was open and obvious, if there was any danger in the usual operation of the same. Blundell v. Mfg. Co., 88 S. W. 103; Chrismer v. Bell Telephone Co., 92 S. W. 384; Wagner v. Railroad, 33 Kan. 660; Rush v. Railroad, 36 Kan. 129; Weld v. Railroad, 39 Kan. 68; Clark v. Railroad, 48 Kan. 654; Shroeder v. Railroad, 47 Kan. 315; Walker v. Scott, 67 Kan. 814; Daniels v. Creamery Package Co., 83 Pac. 986.

LAMM, J.—James W. Charlton was a freight brakeman in the defendant's employ. In June, 1902, while climbing the ladder of a box car in his train, his body came in contact with a standpipe or water crane maintained by defendant close to its track to supply its passenger engines with water at Paola, Kansas. He was knocked from the car and mortally wounded, shortly thereafter dying in a hospital.

His father and mother sue by virtue of certain statutes of the State of Kansas for $10,000 damages.

At the close of plaintiff's case, the court gave an instruction on behalf of defendant in the nature of a demurrer to the evidence. Thereupon plaintiffs took a nonsuit with leave, and, having unsuccessfully moved the court to set the nonsuit aside, they bring the case here by appeal.

The statutes of Kansas pleaded (and proved at the trial) were as follows:

*First.* Paragraphs 418 and 419 of the General Statutes of Kansas of 1897, chapter 95, the same being paragraphs 4686 and 4687 of Dassler's Compilation of 1899 of the General Statutes of Kansas.

Paragraph 418. "When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he lived against the latter for an injury for the same act or omission. The action must be commenced within two years. The damages cannot exceed ten thousand dollars, and must inure to the exclusive benefit of the widow and children, if any, or next of kin, to be distributed in the same manner as personal property of the deceased."

Paragraph 419. "In all cases where the residence of the party whose death has been or hereafter shall be caused as set forth in section 422 of the civil code of 1868 (the next preceding section) is or has been at the time of his death in any other State or Territory, or when being a resident of this State no personal representative is or has been appointed, the action provided in this section may be brought by the widow, or when there is no widow, by the next of kin of such deceased."

*Second.* Paragraph 19, chapter 109, of said General Statutes of Kansas, 1897, the same being paragraph 2459 of said Dassler's Compilation, and reading thus:

"If the intestate leave no issue, the whole of his estate shall go to his wife; and if he leave no wife nor issue, the whole of his estate shall go to his parents."

Having set forth defendant's incorporation and business as a domestic railroad corporation, transporting freight and passengers in Missouri and Kansas, and that said road passed through Paola, etc., the petition pleaded the foregoing statutes and bottomed a right to recovery thereon upon the averments of fact that James W. Charlton was in its employ as a brakeman on one of its freight trains passing through Paola on June 26, 1902; that he was a non-resident of said State and resided in Missouri; that no administration had been taken out in Kansas, he leaving no property there to administer upon; that he was twenty-nine years of age and died intestate, without issue; that he was materially aiding in supporting his parents in Missouri; who, through financial straits and indifferent health, were in need of such support; that plaintiffs were his father and mother and under the said laws of Kansas, as construed by its courts of final resort, a cause of action survived and existed to plaintiffs because of the negligent and wrongful death of said James W. Charlton caused by defendant, in manner as follows:

"That at the town of Paola defendant had erected on its roadway an iron standpipe or water crane, for the purpose of supplying its engines with water; that defendant negligently erected said standpipe or water crane some time prior to said 26th day of June, and on said day was negligently maintaining the same, and long prior thereto had negligently maintained the same so near to its tracks, to-wit, at a distance of about eighteen inches or two feet from the side of a passing car, as to endanger the safety and lives of defendant's employees, at work upon its trains and cars that might pass through said town of Paola, and along by said standpipe or crane; that said standpipe or crane was

thus negligently erected and maintained by defendant so near to said track as that it was likely to strike and knock from their cars and injure or kill the employees of defendant, particularly its brakemen on its freight trains, while in the performance of their duties on trains passing said standpipe or crane; that on said 26th day of June, 1902, one James W. Charlton was in the employ of defendant as a brakeman, and on said day was at work on one of defendant's freight trains that passed through said town of Paola in said State of Kansas, and by said standpipe or crane; that as said train and the car upon which said James W. Charlton was riding, passed said standpipe or crane, said James W. Charlton, while in the performance of his duties, and while standing upon the ladder upon the side of the box car upon which he was riding, was struck by said standpipe or crane, there not being sufficient space between the side of said box car on which he was riding and said standpipe for his body to pass, owing to the negligence of defendant as aforesaid in negligently maintaining and erecting said standpipe or crane so near said tracks; that said James W. Charlton by striking said standpipe or crane was knocked from said car to the ground and mortally wounded; that as a direct result of his injuries through said negligence of defendant said James W. Charlton on the 17th day of August, 1902, died.''

The answer pleaded five defenses, _viz._: _First._ That whatever cause of action existed in favor of plaintiffs growing out of the death of their son by injuries received while in the employ of defendant at Paola, Kansas, the same grows out of the laws of said State and is not enforceable in Missouri. _Second._ A denial of each and every allegation in plaintiffs' petition. _Third._ That under the laws of the State of Kansas the deceased had no cause of action against defendant; that the deceased was an employee of defendant; that

the relation of employer and employee was governed by the laws of said State, and under said laws the deceased (if he had survived) had no cause of action for the injuries received by him; that whatever cause of action, if any, plaintiffs may have as the result of the death of their son, accrued in Kansas, and deceased having no cause of action for his injuries under those laws, none accrued to plaintiffs. *Fourth.* That James W. Charlton's injuries were the result of his own negligent and careless conduct, or that his own negligence contributed thereto. And, *fifth,* that the injuries received by James W. Charlton were the result of one of the usual and ordinary risks of the business in which he was engaged, and that he assumed all such risks.

At the trial after proving the statutes of Kansas as pleaded, plaintiffs produced in evidence an opinion of the Supreme Court of that State (Railroad v. Ryan, 62 Kan. 682), in which the phrase, "next of kin," used in said paragraphs 4686 and 4687 of Dassler's Compilation is construed. The construction there placed on that phrase was: "That it comprehends all those who inherit from deceased under the statutes of descents and distributions."

During the trial certain evidence offered by plaintiffs was excluded. It is contended here that error was committed in this behalf (as well as in forcing a nonsuit), and such rulings on evidence will be noted.

The facts uncovered below are as follows:

Harry Ryan testified in chief, in substance, for plaintiffs, that he lived in Paola, was working at a lunch counter at the Frisco depot and saw Charlton get hurt at about six o'clock in the morning on the 26th day of June, 1902. There was a standpipe or water crane, of iron, north of the depot in a brick platform extending from the depot. Connected with the top of this water crane, is a spout, used to fill tanks of defendant's engines, and when not in use it hangs to the

north, on the west side of the main track.   There is an
iron rod which extends closer to the track than the
crane that witness thought was a brace to hold the
spout.   This rod or brace struck Charlton some place
in the back, and was as big as your finger—the stroke
bending the rod.   That morning Charlton came into
Paola on a freight train going north.   Its engine
stopped to take water at a wooden water tank south
of the depot.   Deceased left his train here and ran up
to witness's lunch counter to get something to eat and
was telling witness about "hoboes beating him in."
(This answer was struck out on the motion of defend-
ant, but no reason was assigned for the motion, and
plaintiffs excepted to the rulings of the court.)   As
near as we can gather the witness and another man
named Harris, now dead, left the lunch counter with
decedent to see what he would do with the "hoboes."
These nondescripts at that time were on the north
side of the crane.   The train at that time was pulling
north towards the crane, and as it came up they (the
"hoboes") caught it, went through to the other side
and were running back towards the rear, that is, to the
south of the train, and the witness stooped down and
saw them running and hallooed to Charlton that they
were going to the back end; that they were going south
and witness pointed Charlton in that direction.   When
witness hallooed thus to Charlton he had reached the
train, then going at about ten or twelve miles an hour,
and as quick as a ladder got to him he jumped on.
At that time he was about twenty or thirty feet south
of the water crane.   He was "looking south, away from
the train" (i. e., as we infer, not north toward the head
of the train), over some coal cars and at the "hoboes"
and was on the first round or two of the ladder when,
as the car pulled by the crane, the iron beam or little
rod, extending out some two or three inches closer to
the track, struck him and knocked him to the ground

between the track and the platform and the trucks and boxing knocked his body from between the rail and brick platform. Thereat Harris signaled the crew to stop and they took Charlton to the lunch counter and thence to the hospital, who was so badly hurt he was unconscious. The crane is 200 feet or so north of the depot and defendant's track there runs north and south.

On cross-examination this witness, who had testified in chief that the crane was about two and a half feet from the track, said that he had made no exact measurement of the distance; that it was now (at the trial) as it was then. Witness knew nothing of how long the crane had been where it was, but it had been there as long as he had worked at the lunch counter or lived in Paola, we cannot make out which. (Whichever it was, it was longer than the time decedent had run on the road.) Witness did not know how often Charlton had come through Paola — had gotten acquainted with him at the lunch counter. Charlton was attempting to climb on a box car when struck. Then this question was asked him: "What was his position with reference to the car — was he close to it or leaning from it?" The answer was: "I don't know; I think he was leaning out a little; I don't exactly remember all that." Witness said by stooping down he could see the legs of the tramps running south, and they were black legs; witness saw Charlton when he fell to the ground north of the crane, saw him when hit, and saw what hit him. He was the first person to him and it was daylight at that time.

By Mr. Lane, plaintiffs showed that he took certain measurements at Paola where he had lived about twelve years. Witness said there was one main track of the Frisco running east of the platform and depot. The water crane that struck Charlton was on the west side of that track and north of the depot. The brick

platform extends from the depot to beyond the crane.
The crane is 122 feet from the depot. There is a large
wooden water tank south of the depot 112 feet and on
the same side of the track as the water crane. From this
tank, to the water crane, it is 291 feet. The restaurant
that Charlton went into that morning is west of the
crane and a little bit north. The crane is of iron and
nine feet, seven inches around at the base. Witness
did not measure it five or six feet above the base, but
thinks it about six inches in diameter at that point.
There is a spout at the top of the crane, which, when
not in use, witness thought hangs to the south. When
the crane is in use they swing the spout around over
the track. There is an iron rod at the side of the
crane, next to the track, and about three or four inches
from the crane. On this rod there is a dent, seven feet,
one and one-half inches above the platform. (This dent
is presumably the bend in the rod caused by its striking
Charlton, referred to by the former witness.) Witness
measured the distance of the crane from the west rail
of the track — not only at the base, but at the dent.
The crane is larger below than above and is three feet,
eight and one-half inches from the west rail of the
track at its base. At the point where the rod was bent
or dented it was four feet, six inches from the west
rail. A box car projects over the rail. Witness meas-
ured box cars at Paola standing on defendant's track to
determine their projection over the track. (The ques-
tion leading up to this answer was objected to by de-
fendant because it was not shown what cars were in
the train when the accident occurred. "That fact can
be shown" and the measurements are objected to "un-
less they show the same cars, and built as the car in this
train." Which objection was sustained, plaintiffs ex-
cepting.) Continuing, witness said he measured sev-
eral kinds of box cars on defendant's tracks at Paola.
"Q. Will you give the measurements of the box cars?"

(Defendant here objected to the question because "it should be confined to the cars of this train." Objection sustained, plaintiffs excepting.) Witness continuing, said he knew the projection of the average standard car. At this point defendant's attorney took the witness in hand and in response to inquiries it appeared witness got his information from his measurements and came to a conclusion therefrom; that the measurements were made at Paola and at no other point. Witness was never in the railroad business. Continuing, in response to plaintiff's attorney, witness said that he had observed box freight cars on railroads all his life, and on being inquired of what the average projection of a standard box car beyond the rail of the track on which it runs was, was not allowed to answer — defendant objecting generally, and the court sustaining said objection.

On cross-examination, the witness identified photographs presented to him by defendant's attorney, and which said photographs were put in evidence and by stipulation were presented to and viewed by this court. He testified that four feet above the bottom of the water crane it is smaller than at the bottom and maintains the smaller size to the top, to-wit, a diameter of six or seven inches. The water crane was in plain view and any one can see it in daylight.

By Mr. Logue, plaintiffs showed that he resided in Kansas City for fourteen years; was now a printer, but had been a brakeman on defendant's railroad in 1900 and 1901 and ran through Paola and was familiar with the environment there. When witness ran on the road it was known as the Ft. Scott & Memphis road— now operated by defendant. Then this occurred:

"Q. Now, did you observe in passing through there on freight trains and box cars how near a train was to that crane in passing. A. Not exactly in passing—I knew.

"Q.  You never measured it?  A.  No.

"Q.  Did you observe its nearness?  A.  Yes.

"Q.  State how near the crane would be to a passing train.  A.  I would say—on some cars, of course, some are wider than others.  One time my arm in passing there brushed against it.

"(Defendant moved to strike out the last answer as incompetent.  The court sustained the motion and struck out the answer.  To which action of the court the plaintiffs excepted.)"

Continuing, witness said the crane would be two feet from an ordinary box car.  Witness said he was familiar with the duties of a brakeman; that on a box car is a side ladder and all the ladders have iron rods projecting about three or four inches from the car; that a brakeman often uses the ladder when the train is in motion, and his duties require him to use it more when in motion than when not.  At this point in the trial the following occurred:

"Q.  Now, what are the brakeman's duties with reference to keeping bums or trespassers off the cars.

"(Defendant objected to the question.  The court sustained the objection.  To which ruling of the court the plaintiffs excepted.)

"Q.  I will ask you what brakemen on freight trains in this country generally do with reference to trespassers or bums that they may find on the cars?

"(Question objected to by defendant and the court sustained the objection.  To which ruling of the court the plaintiffs excepted.)

"Q.  I will ask you the question this way:  Do you know what the brakemen on the Frisco habitually do with reference to trespassers or bums on freight trains?

"(Defendant objected to the question and the court sustained the objection.  To which ruling of the court the plaintiffs excepted.)

"Q. Do you know the average distance that a standard box car projects beyond the rail of the track on which it is running?

"(Defendant objected to the question on the ground that it was not competent. The court sustained the objection. To which ruling of the court the plaintiffs excepted.)"

Continuing, the witness in response to a question of whether he knew what kind of cars they run over the Frisco road, replied, "I tell you, most any old kind of a car." Witness said they ran the same kind of cars that are run on all roads; that the projection of a box car commonly run on defendant's road at Paola is about twenty-five inches—twenty-four or twenty-five inches; that some cars project over the rail twenty-seven or twenty-eight inches, and said that besides his general observation he had measured box cars that projected as far as that.

On cross-examination witness said he never worked for the Frisco, but said he could name cars that run over the Frisco; could not say they ever ran through Paola, but saw them in defendant's yards at Kansas City; that he had seen six or seven cars that he had measured at various times; had measured cars at the request of one of the plaintiffs, Mr. Charlton, and for the purpose of testifying; had visited Mr. Charlton at his home at Buckner, Missouri, and had talked with him about the case. Continuing, the witness mentioned one car by number—a stock car that projected twenty-two and one-half inches, not including the ladder; and another that projected twenty-six and one-half inches —a coal car; another that projected twenty-one and one-half inches; another that projected twenty-one inches; another that projected twenty inches; another that projected twenty-four inches; another that pro-jected twenty-seven and one-half inches. These were cars that run on defendant's road or its

branches. Witness said that the track was straight at Paola and any one could plainly see the water crane; that decedent had good eyesight; that freight trains did not stop at the crane; they generally took water at the wooden tank south of the depot; that the water crane was used for passenger trains.

On being pressed on cross-examination, the witness said that sometimes he had the water crane in mind and sometimes he didn't when he passed it on a train. Then the following occurred:

"Q. You say you did at times? A. I did at times. In fact, I was a little afraid of it. It was a little too close to suit me.

"(Defendant moved to strike out the last answer and the court sustained the motion.)"

Continuing, the witness said there was a crane on defendant's road at Olathe, Kansas. He had measured how far that one was from the track and it was five feet from the outside of the west rail. He also measured two at Kansas City and one at Rosedale. The one at Rosedale is four feet, ten inches from the track.

On re-direct examination the witness said he made these measurements at the request of plaintiff, Mr. Charlton; that he measured others besides those inquired of by defendant's counsel, one at Kansas City which is six feet from the outside rail, and another there that is four feet, eight and one-half inches. Then the following occurred:

"Q. Would a brakeman's duties on a run from Kansas City to Fort Scott familiarize him more with the crane at Paola than the cranes at Kansas City?

"(Defendant objected to the question as speculative and the court sustained the objection. To which ruling of the court the plaintiffs excepted.)

"Q. What use is made of the crane here in Kansas City that is six feet from the track?

"(Defendant objected to the question and the court

sustained the objection. To which ruling of the court the plaintiffs excepted.)

"(Plaintiffs here offered to prove that all freight trains starting out of Kansas City take water at this crane that is six feet from the track, which offer was rejected by the court.)"

The plaintiffs produced themselves as witness. The father testified that his son had been working as a brakeman for defendant about three months; that he lived in Kansas City, Missouri, was twenty-nine years old and had never been married; that his co-plaintiff was mother of decedent; that there was no administration of the estate in the State of Kansas; that decedent was a strong healthy man, weighing from 168 to 178 pounds, was five feet, ten inches in height—with good habits and good business capacity, sober and industrious—earning at the time of his death $65 to $80 a month and running on defendant's road from Kansas City to Ft. Scott. Witness's health was not good for thirty years, was a poor man and in debt. Decedent had been working for himself for six years, but had contributed somewhat towards witness's support and sometimes would lay off to help on the farm.

On cross-examination it was disclosed plaintiff had other children—two younger ones working at home part of the time. Decedent had commenced work for himself on a cable line at $40 a month. Before he went to work for defendant he was firing on the Memphis road, i. e., the road now operated by defendant through Paola, and which stopped operation in September, 1901 (how long he worked for the Memphis road is not disclosed).

By the mother of decedent, it was shown that she saw her son the night after he was hurt. He was then paralyzed. He was brought to the German Hospital at Kansas City and died there of his injuries—being

paralyzed till his death. The remainder of her testimony follows closely the trend of her husband's.

It will be seen from the foregoing evidence, the crane was about three feet in diameter at its base, while five or six feet above its base it narrowed to, say, six inches, and continued that diameter to the top. Fastened to and running up and down this water crane, from two to four inches distant (and that much nearer the track) was a rod as thick as one's finger and this rod was the projection that struck decedent. While the evidence does not show the height of the whole affair, yet the photographs introduced in evidence and exhibited to us indicate it was at least nine or ten feet high. The same photographs show the rod commencing about three and a half feet from the ground and running up nearly vertically along the crane for, say, five feet. But at the point decedent came in contact with it is somewhat closer to the track—say, two inches—than it is at the lower end.

Such is the case on the facts. On this record, was it error to allow the demurrer?

I. In getting to a right conclusion, certain questions may be eliminated at the threshold of the discussion. For instance, the answer, somewhat as a conclusion of law, pleads that the cause of action accrued in Kansas, grew out of an employment in that State and out of the laws thereof, and, hence was not enforceable in Missouri. As it looks to us, this proposition is not pursued or contended for by defendant on this appeal; but, if contended for, it is not tenable. [Lee v. Railroad, 195 Mo. 400.]

Again, in solving the problem submitted, it may be assumed that the parents of decedent were entitled to the damages, if any, sued for; and this is so, because said paragraph 2459 of Dassler's Compilation of the General Statutes of Kansas (the same being the applicable part of the law of descents and distributions of

that State), is held in Railroad v. Ryan, 62 Kan. 682, to control in this character of a case. That is to say, the phrase "next of kin" used in the damage act, to-wit, in said paragraphs 418 and 419, is construed by the Ryan case to mean those who inherit from deceased under paragraph 2459 — in this instance, the father and mother.

It follows that a bar to a recovery cannot be based on the theory that plaintiffs as parents could not sue, nor on the other theory that the statutes in hand are not enforceable in our own State.

II. Said statutes (paragraph 418, *supra*) provide that an action lies for damages on account of the death of a person caused by the wrongful act or omission of another when, and only when, decedent himself could have maintained an action had he lived. This being so, the main question may be stated in this way: Had decedent survived, would an action lie in his favor for the injuries complained of?

Defendant's counsel say, No, because decedent (as a matter of law), in the first place, assumed the risk of being struck by the rod appended to the water crane; and, in the second place, was guilty of contributory negligence. Of these, *seriatim.*

(a) Whether in the enforcement of a statute of a sister State, which enforcement calls into play a construction of the common law, we should adopt our own construction of the common law (and thus avoid being double-tongued), or adopt a different construction of the common law, one, for example, entertained by the courts of last resort in such sister State (and so speak with two voices), has been a vexed question. [Lee v. Railroad, supra, 1. c. 422; Root v. Railroad, 195 Mo. l. c. 369, *et seq.;* Fogarty v. Transfer Co., 180 Mo. 490.] The law in that behalf may yet be in a formative and fluent condition. Be this one way or the other, in the case at bar no difficulty exists. In the Lee case,

*supra,* we had before us the same sections of the Kansas Damage Act under review now. In that case, substantially the same contentions were made by the defendant. In that case it became necessary to examine the decisions of the Supreme Court of Kansas and to ascertain the state of the law on questions of assumed risks and contributory negligence. As a result, it was held that there is no substantial conflict between the decisions of this court and that. We may proceed, therefore, to a consideration of this case levying tribute and relying indiscriminately on the pronouncements and doctrines of either court.

(b) Assumption of risks rests on contract—negligence rests in tort. [Dale v. Hill-O'Meara Construction Co., 108 Mo. App. 1. c. 97.] The servant, when he enters his master's employ, impliedly agrees with him, for the compensation named, to assume the risk of usual dangers incident to the work. But the servant does not assume the risk of the master's negligence, for a very good reason, and that is, because it is a fundamental proposition that it is against public policy for a master to contract against his own negligence. So, too, in the assumption of risks by a servant it is well to consider a certain assumption by the master, and that is, that the master impliedly contracts with the servant that he will exercise ordinary care to protect such servant from injury by providing a reasonably safe place for him to work. When these two assumptions are considered as proceeding hand in hand, it will be perceived that the risks assumed by the servant are those risks alone *which remain after the master has exercised ordinary care.*

In Curtis v. McNair, 173 Mo. 270, VALLIANT, J., speaking for this court, said:

"A servant assumes the risk of danger incident to the work he engages to perform, and if he is injured as a result of that which was to be expected in the usual course of such work, the master is not liable. There

200 Sup.—28

are many kinds of business the operations of which are attended with danger which cannot be prevented by ordinary care and precaution. When one engages in such business and suffers from causes incident to its character, he has no legal remedy. In such case he suffers, not because of negligence of his master, but because of a danger incident to the business. But the only risk the servant does assume, is of that which is liable to happen on account of the nature of the business when the master has used reasonable care to avoid such a result.

"It is the duty of the master to exercise reasonable care, commensurate with the nature of the business, to protect his servant from the hazards incident to it. [Williams v. Railroad, 119 Mo. 316; Rodney v. Railroad, 127 Mo. 676; Herdler v. Buck's S. & R. Co., 136 Mo. 3.]

"This duty the law imposes on the master and will not allow him to cast it off. It is contrary to public policy to allow the master to relieve himself by contract from liability for his own negligence. What the law forbids to be done by express contract, it will not assist to be done by implying a contract.

"A risk which the law, on the ground of public policy, will not allow the servant to assume, it will not imply from his conduct that he has assumed. [Blanton v. Dold, 109 Mo. 64; Settle v. Railroad, 127 Mo. 336; Pauck v. St. L. Dressed Beef Co., 159 Mo. 467; Wendler v. People's H. F. Co., 165 Mo. 527.] The servant never assumes the risk of the master's negligence.

"In a suit, therefore, by a servant against his master in which the petition alleges that the plaintiff's injuries were due to defective appliances furnished by the master for the use of the servant, the dangerous condition of which was known or by the exercise of ordinary care would have been known to the master, a plea which sets up that the condition was also known or

by the exercise of ordinary care on his part would have
been known to the servant, does not constitute a de-
fense to the action on the theory of an assumption of
risk by the servant, because the servant cannot assume
to bear the consequence of the master's negligence.''

A servant, however, may contract with his master
to work in a place and with tools of a certain kind and
condition. He may know precisely what he is doing.
The tools may not be of the best and he may be willing
to use them as they are. The place provided by the
master for him to work might have been safer, but the
servant knows it all, or has such means of knowledge as
amount to knowledge, and may be willing to take and
hold service under existing conditions. . What may be
the law covering assumption of risks under such cir-
cumstances is not necessary for us to consider; for
there is no evidence here that Charlton knew how close
this water crane and projecting rod were to defend-
ant's track, nor had he such means of knowledge as
would be equivalent to knowledge. No one told him of
the distance. The knowledge, if any he had, under the
facts in proof, was such only as might come to him
while he was attending to and absorbed in his duties as
a trainman, running through Paola and stopping, pos-
sibly, for water at the wooden tank. On such proof,
we are not willing to say as a matter of law that he
should be held to know the distance of the crane and
rod from the track, that is, the danger therefrom. It
is a matter of common observation that there is a rad-
ical difference between average people in power of ac-
curate observation. The language of the Supreme
Court of Kansas in Rouse v. Ledbetter, 56 Kan. l. c.
352, is apposite here. That court there says: ''The
faculty of close observation of objects is largely a gift.
Some persons may walk once along a street and be able,
without any special effort, to describe every prominent
object upon and every projection into the street, while

others might go up and down the same street for a year, who could not describe such objects and projections."

The crane maintained by defendant was not an appliance directly touching the duties of decedent as a brakeman on freight trains. Freight trains did not use that crane. Its location and maintenance pertained to a railroad department other than decedent's—its use was for other employees. He had not been warned of danger from the proximity of that crane. His own business as a brakeman was of such an exacting kind as to require his close attention thereto, and, therefore, in our opinion, under the proof here he was entitled to labor for his master in reliance upon the assurance of that master, implied by his employment, that such master would exercise due and ordinary care to preserve his life from the danger of projections maintained by the master on the right of way so negligently close to the track as to put him in peril while he was using due care about his master's business and in the line of his duty.

On a trial anew the defense of assumption of risks may assume another phase. We hold that on the facts now before us such defense cannot be declared as a question of law, and, hence, the demurrer cannot be sustained on that theory.

(c)   The case being bottomed on the alleged negligence of defendant, the next question is, was such negligence proved? Defendant insists it was not, plaintiffs insist it was, and the main controversy is pitched at this point.

Negligence is the absence of due care. Due care is a duty lying at the root of the social compact. Right early in the history of the human race the question was asked:  Am I my brother's keeper—an old, old question, but yet new withal.  Whatever doubt may have

arisen in the mind of the unhappy man who first asked
it, no doubt exists in the law on the right answer, then
or now. In Van Winkle v. American Steam Boiler Co.,
52 N. J. L. l. c. 247, BEASLEY, C. J., speaks for that
learned court, as follows: ''The law hedges round the
lives and persons of men with much more care than it
employs when guarding their property, so that, in this
particular, it makes, in a way, every one his brother's
keeper, and, therefore it may well be doubted whether
in any supposable case redress should be withheld from
an innocent person who has sustained immediate dam-
age by the neglect of another in doing an act which,
if carelessly done, threatens, in a high degree, one or
more persons with death or great bodily harm.''

In the leading case of Murphy v. Railroad, 115
Mo. 111, this court had before it a case not differing
in essential features from the one at bar. In one re-
spect the Murphy case does differ, in that Murphy, the
engineer, at the time he was injured by a permanent
structure, to-wit, a wing-fence, had assumed a some-
what unusual attitude on the side of his engine, though
it was in the line of his duty as the court held under
the peculiar facts there existing. In the case at bar
there is no evidence that Charlton assumed an unusual
attitude. He was on the brakeman's ladder on the side
of the car. It is true the evidence indicates he leaned
out a little, but it would be straining at a gnat (while
swallowing a camel) to allow the case to ride off on
the theory that the angle at which he leaned out, under
this proof, was unusual. Two of the syllabi of the Mur-
phy case formulate the gist of the matter, and are as
follows:

''A railway company is required to place its signal
posts, cattle-guard fences and other structures used in
connection with the road at a safe distance from the
track to the end that they will not be dangerous to its
employees in operating the trains.

"Where the company has itself placed such structures so near the track as to be dangerous to its servants in the discharge of the duties assigned to them and an injury occurs from that cause without fault on the part of the servant injured, the liability of the company is fixed."

It may be conceded that other courts have arrived at a different conclusion than that announced in the Murphy case, on a practically equivalent condition of material facts; but the doctrine of that case has never been criticised by this court, seems sound, and is strongly supported elsewhere. [Railroad v. McDade, 191 U. S. 64; Railroad v. Michaels, 57 Kan. 474; Railroad v. Thompson, 94 Ala. 636; Railroad v. Davis, 92 Ala. 300; Railroad v. Mansell, 138 Ala. 548; Central Trust Co. v. Railroad, 73 Fed. 661; Withee v. Railroad, 98 Mo. 61; Railroad v. Thompson, 210 Ill. 226; Kelleher v. Railroad, 80 Wis. 584 (the doctrine of this case may not have been followed in a later one, Scidmore v. Railroad, 89 Wis. 188); Railroad v. Welch, 52 Ill. 183; Whipple v. Railroad, 19 R. I. 587.]

Cases may be found from Indiana, Iowa, Washington, New York, Massachusetts and Michigan (and perhaps from other States), referred to by defendant's learned counsel, which lend countenance to another view; but an analysis of those cases will show that while in some instances they run counter to the doctrine of the Murphy case, yet in other instances the facts dealt with are so essentially different as to make the cases not in point. For instance, in a very late Michigan case, Wilson v. Railroad, 108 N. W. 1021, a brakeman was caught while on the ground between a car and a cattle chute. He had full command of his own movements. The danger was obvious and glaring and well known to him, and it was held there could be no recovery. In Jennings v. Railroad, 7 Wash. 275, a conductor of a cable car was smashed between the car and the

side of a door in the powerhouse. The space was too small for a man's body. He was familiar with that fact. He had full command of his own movements, and under the circumstances it was held there could be no recovery. Cases from Indiana should possibly be read in the light of the doctrine of that court to the effect that plaintiff is held in effect to prove a negative, to-wit, the absence of contributory negligence (Railroad v. Stick, 143 Ind. 1. c. 453; Railroad v. Finney, 145 Ind. 1. c. 556), while in Missouri the doctrine is that contributory negligence is an affirmative defense of which defendant carries the burden of proof, though, of course, contributory negligence in a given case may be made out on plaintiff's proof alone.

In the Murphy case the board doing the mischief was thirty inches from the rail at the bottom and about forty-eight inches from a perpendicular to the rail at the top. In the case at bar, as we understand the record, the crane proper was fifty-four inches from a perpendicular to the rail. The rod was, say, four inches nearer such perpendicular, leaving fifty inches. The hand-holds, constituting the ladder of a box car, project, say, four inches. That leaves forty-six inches from the rod to a perpendicular to the track. If twenty-seven and one-half inches be deducted for the projection of a very broad car there would be left eighteen and one-half inches. We decline to say as a matter of law that eighteen and one-half inches are a reasonably safe distance for such a structure. If instead of taking the projection of a broad car we take a car projecting twenty-two and one-half inches, that leaves a space of twenty-three and one-half inches from the hand-hold to the rod. We decline to say as a matter of law that that is a safe distance. In ascending a ladder the body is not usually compressed against the ladder, even if the face be turned to the wall. But if the body be turned, as may very well be, for the purposes of observation,

signalling, or otherwise; or if occasion arises to lean out somewhat, the danger of coming in contact with the rod is apparent.

The evidence, so far as permitted at the trial, showed other water cranes of defendant were not as close to the track as the one in question, and we can conceive of no legitimate necessity for maintaining a water crane so close to a passing car as to be dangerous to a brakeman in the line of his duty. Therefore, to maintain a water crane at an unsafe distance when a safe distance might be ascertained by the simple application of foot rule or tape line, ought to be held negligence in a master, and the issue of negligence should have been put to the jury in this case, unless decedent was guilty of contributory negligence.

(d)   Was decedent guilty of contributory negligence? He left his train to get a lunch. Shall we hold that negligence? Hardly, as long as men must eat in order to live. Defendant does not contend that only hungry brakemen are good brakemen. He mounted his train when in motion to resume his duties. Was that usual act a negligent one in a freight brakeman? Certainly not. It is suggested that he mounted the train on the wrong side of the crane and, therefore, was guilty of negligence. But why (having an eye to mounting a car) should there be a wrong and a right side to a crane, and how can we say that a brakeman can mount a moving train at any place he may choose? But, it is said he was observing tramps, who either had been or threatened to become trespassers on the train, and, therefore, was not in the line of his duty. Defendant's counsel stoutly insist that he had no such duty and, therefore, was inattentive to his master's business and was transacting simply his own. That is to say, in the absence of proof we shall assume that a freight brakeman has no concern with tramps—no duty to perform in that regard. We take it this is rather a narrow view of the duty of a brakeman, who, with other

trainmen, have charge of valuable property of the master exposed to depredation from such lawless nondescripts and whose own lives may be in danger therefrom. But be that as it may, the plaintiff undertook to introduce evidence showing the duties of brakemen, which evidence was excluded, and the propriety of which ruling is presently to be considered.

On demurrer, plaintiffs were entitled to the full force of all their evidence—direct and inferential. They were entitled to every reasonable inference fairly deduced from the facts proved; and on this record it ought not to be said, as an irresistible conclusion of law, that decedent was guilty of contributory negligence. The court, therefore, erred in granting a demurrer, and erred again when it refused to set aside the involuntary nonsuit.

III. As the case must be tried again, it becomes necessary to consider questions pertaining to the admissibility of evidence.

(1) Harry Ryan testified that when Charlton came into the lunch room he spoke to him about "hoboes beating him in," which answer was struck out on motion of defendant. The particulars of this conversation between Charlton and Ryan would be hearsay, but the fact that a conversation was held and the identification of the subject-matter of that conversation, we think, was relevant. In no other way could the jury have a connected or rational view of happenings immediately afterwards in relation to these tramps in which witness, Harris and decedent played a part.

(2) Mr. Logue was a witness for plaintiffs. He had been a brakeman, working on defendant's road, and was familiar with the crane. He never measured its distance from a car, but he knew that it brushed his arm once in passing. This evidence was excluded. We think it competent proof. It tended to show the nearness of the crane and its appendages, and, hence,

the incident dangers. If the witness assumed an unnatural and unnecessary position when brushed by the crane, that was a matter to be developed by cross-examination. The prima facie presumption was he was exercising due care and was in a usual attitude, and it devolved on defendant to overthrow this presumption.

Furthermore, that accidents have theretofore happened under the same conditions at a given spot from the same cause seems competent proof. [District of Columbia v. Armes, 107 U. S. 519; Golden v. City of Clinton, 54 Mo. App. 100.] Tending in the same direction, though on a different matter, is a line of fire cases holding that the escape of fire from other engines at other times may be shown. [Campbell v. Railroad, 121 Mo. 340; Matthews v. Railroad, 142 Mo. 645.]

(3) By the same witness plaintiffs undertook to prove the duties of a brakeman with reference to keeping trespassers off the cars, and the testimony was excluded. There are two ways of proving a line of duty. One way would be to show the master's rules and orders. But if such rules and orders were shown, that does not settle the question of duties, because with the master's acquiescence these rules and orders may be entirely ignored, and a new list of duties and customs grow up in lieu thereof with the master's acquiescence. There is another way, and that is to actually prove what brakemen usually do. We think, therefore, this witness was competent to testify to the usual duties of a brakeman, and if those duties in any way pertained to putting off tramps or keeping them off the cars, the facts should be developed. This course has been allowed as a practical one. [Farber v. Railroad, 139 Mo. l. c. 278, *et seq.;* see, also, Farber v. Railroad, 116 Mo. l. c. 94-6; Krueger v. Railroad, 94 Mo. App. 462.]

(4) By the same witness, Logue, it was shown that he had observed the crane. Defendant's counsel then

propounded to him this query: "You say you did at times?" (That is, observed the crane.) The answer was: "I did at times." The witness then volunteered the remark: "In fact, I was a little afraid of it; it was a little too close to suit me." The court on motion struck out the whole answer. This was wrong, but the last part of it, to the effect that the witness was afraid of it, and it was too close to suit him, should have been struck out. It was a mere voluntary remark—a conclusion of the witness, and put in for coloring matter. If counsel had asked his reason for noticing the crane and the witness had given those reasons, the matter might have stood on a different foot.

(5) Having shown that there was a crane at Kansas City further from the track, plaintiffs sought to show by Logue that the duties of a brakeman would familiarize him more with one crane than with another. This was excluded as speculative, and we think, correctly. But information was sought from this witness as to the use of the Kansas City crane, and it was excluded. Following that, plaintiff tendered testimony to prove that all freight trains starting out of Kansas City took water at a crane six feet from the track. This offer was rejected by the court. We think this competent proof. Decedent's train did not water at the crane at Paola. If his trains took water at a crane six feet from the track at Kansas City, that was a circumstance throwing light on the issue of contributory negligence; and it was a circumstance going deeper than that, and tended to show there was no imperative physical necessity in the maintenance of a crane so close to the track as the one at Paola, and hence tended to show the Paola crane was negligently maintained by defendant.

(6) Plaintiffs sought to show by Mr. Lane that he made measurements of the width of defendant's freight cars at Paola. Mr. Lane was not a railroad man, was

not advised by his experience or training of the average width of such cars and hence was incompetent to testify to that fact.  But in the absence of knowledge on the part of plaintiffs of the identical car doing the injury and the width of such car, and its projection over the rail, plaintiffs were entitled to the next best proof of which the facts were susceptible, to-wit, to show the various widths of cars used on defendant's road, and hence the measurements taken by him should have been admitted.

The cause is reversed and remanded, with directions to the circuit court to sustain plaintiff's motion to set aside the nonsuit and proceed with a new trial in accordance with this opinion.

*Brace, P. J.,* and *Valliant, J.,* concur; *Graves, J.,* concurs in the result.