WILSON *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

1. MASTER AND SERVANT — PERSONAL INJURIES — ASSUMPTION OF
RISK—RAILROADS.
> A railroad brakeman assumes the risk of being injured between
> a cattle chute near the track and a passing car, where he is
> familiar with the location of the chute and it is apparent to
> him in the exercise of ordinary care that the space between
> the chute and an ordinary car is not sufficient for him to
> pass, though he does not know the precise distance by meas-
> urement.

2 SAME—CONTRIBUTORY NEGLIGENCE—PRESUMPTION.
> Where a railroad brakeman is killed by being crushed between
> a cattle chute near the track and a passing car, he being
> familiar with the surroundings and there being no necessity
> for his going between the cars or on the side of the track on
> which the chute is situated, and the situation being such that
> a casual glance would apprise him of his danger, the presump-
> tion that he was in the exercise of ordinary care is negatived.

Error to Calhoun; Hopkins, J. Submitted May 2,
1906. (Docket No. 76.) Decided September 20, 1906.

Case by Belle H. Wilson, administratrix of the estate
of William Earl Bryant, deceased, against the Lake
Shore & Michigan Southern Railway Company for the
negligent killing of plaintiff's intestate. There was
judgment for plaintiff, and defendant brings error. Re-
versed.

*Dallas Boudeman*, for appellant.

*Hatch & Anderson*, for appellee.

BLAIR, J. Plaintiff brings this action to recover dam-
ages for the death of William Earl Bryant, alleged to
have been caused by the negligence of the defendant, on
October 20, 1904. The negligence charged against de-
fendant in the declaration is:

" That it built, maintained, and permitted to remain a cattle chute so near to one of its tracks in Addison, Mich. (the same not being a depot'or freighthouse in its yards at said place), that while plaintiff's intestate was in the performance of his duties, as aforesaid, and without any fault or negligence on his part, while working on the ground on the side of said car nearest to said cattle chute, that he would be crushed between said cattle chute and said car, as there was not sufficient space between the car so aforesaid on the track of defendant company and said cattle chute to allow the body of plaintiff's intestate, while on the ground between said cattle chute and said car in the performance of his duties, to pass between said car and said cattle chute without crushing and killing him."

At the time of his death, Bryant was a brakeman in the employ of defendant, of several years' experience. Bryant had worked on this particular branch of defendant's road for about a year, though only a part of the time on the east end passing through the village of Addison. Near the side track at Addison, where Bryant was killed, and on the south side thereof, stood a cattle chute which was so constructed that there was only six inches of space between its cross-piece, an oak strip four by six inches, fastened on the front of the chute about the height of a man's breast, and the side of the gondola car by which it is claimed Bryant was crushed. The space between the oak strip and the side of an ordinary box car was about nine inches. There was evidence admitted under objection and exception that it was not consistent with good railroading to build the chute so close to the side track and that it was the only chute along the line which was so close.

On the day in question, Bryant was in charge of the switching operations at Addison. Schneider, the rear brakeman, called by plaintiff, testified:

" I know of Mr. Bryant working around that chute from time to time. Our train would stop there. Addison was a station which did considerable switching. This chute was near the side track, not the main track. * * *

"Q. How frequently would it occur that you would switch cars there when you and Bryant were together? "A. About every day. * * * This cattle chute that I am speaking about was easily seen to anybody that looked toward it. There was no obstruction to the side of it, except that cars would stand in there. When a person came on the side of the car that the chute was on he could see that very easily, and I should think he could see as the cars came up by it how much space there was between the cattle chute and the cars. I never had any difficulty in noticing that place, if I looked at it.

"Q. What do you say as to whether Mr. Bryant or any one else who was on the side of those cars, if they wanted to see how much space there was between the car and that chute would have any difficulty in seeing it, in your judgment?

"A. I don't think they would, in my judgment. * * *

"Q. That was very easily to be seen that it would not clear a man on the side of a car, wasn't it, when you were looking at it?

"A. Yes, sir.

"Q. Anybody could see it, couldn't they?

"A. If they were looking at it."

Louis Rose, a section foreman in defendant's employ, called by plaintiff, testified:

"Had seen Mr. Bryant on that part of the road several times.

"Q. Had you seen him at this particular cattle chute?

"A. I had seen him doing work on that same track. Had seen him backing in cars, setting out cars and doing switching. It is a place that cars have to be changed every day there. That was our usual switching place and I have seen him at this work several times before that. I noticed usually that he was the one that had charge of the switching when the train came in. That he was one of the brakemen that had the head management of it, that went down one day and back the next. * * *

"Q. Was there any difficulty of a person on that side of the train of cars seeing the space between the car and the cattle chute if he had looked in that direction?

"A. No, sir.

"Q. That was easily seen, was it?

"A. Yes, sir."

Jesse C. Lyon, a witness called by plaintiff, testified that he was a member of the coroner's jury at the inquest on the body of Bryant:

"His bruises were through the chest and on the side. One arm was broken two or three times. Noticed no marks on any other part of the body. On that day, in company with the coroner and the jury, I went to the railroad station. Looked over the place where the accident happened, the car, and so on. Saw the gondola car. It was standing perhaps a car length west of the chute. I saw the gondola car at one time in front of the cattle chute. The jury ran the car right up and made measurements right there. * * * We pushed the gondola car down there. When pushed, it came quite close to the chute.

"*Q.* Any trouble seeing that?

"*A.* No, sir; when we shoved the car down opposite the chute I was on the left of the car. As we shoved it down, I could see it was quite close to the chute.

"*Q.* How far do you judge before you measured it that it was coming to the chute?

"*A.* Six or eight inches.

"*Q.* Could you easily see it would come within six or eight inches?

"*A.* Yes, sir.

"*Q.* You could easily see that a car length away?

"*A.* Yes, sir. * * * I was looking at this car when we pushed it back opposite the chute. * * *

"*Q.* There would not have been any trouble for any one who was paying any attention to the looking in that direction to see that it was coming close there?

"*A.* No, sir."

Immediately before the accident, the train crew had placed an Empire Line car near the cattle chute. Schneider testified:

"One end I should judge was right there next to the chute. The east end of the car extended beyond the chute.

"*Q.* So that when you came to back with your coal car which you were going to hook onto the Empire Line car, you would say, would you, that that Empire Line car, some part of it, stood opposite this chute?

"*A.* Yes, sir.

"*Q.* Which end did you back your coal car against; that is, in which direction were you going when you backed your coal car?

"*A.* We were going west. It was between these two cars that I have spoken about. That is, between the Empire car which stood opposite cattle chute and this gondola car, which was the last car of the part of the train that we was backing down to the Empire car that I saw Mr. Bryant pass when I saw him last. At that time the Empire Line car was standing still, and the engine with the other cars that I have mentioned, of which the gondola was the last, was passing toward the Empire car. When Mr. Bryant passed between the two I should think there was about two car lengths of space between them. That would be about 60 feet. At that time the locomotive with these cars attached were moving about as fast as a man could walk. When Mr. Bryant went through between these cars I should judge that he went nearer to the Empire Line car than he did to the gondola or the K. & M. car. I couldn't tell exactly how far he was away from car. * * * On the Empire car I think there was a Jenney coupler, but I don't remember what kind there was on the other. They were automatic couplers, and we didn't have to look after coupling them at all. I don't know the reason why Mr. Bryant would have to go across to look after the coupling. Don't remember what the coupling was that we were going to pull out. As the cars were pushed back by the locomotive, against this Empire car; it didn't shove the Empire car any more than ordinary, and the automatic coupler worked, and it pushed the train far enough west for me to couple onto the car that I was to couple to the west of there, and I coupled it. I then signaled to pull out off of the side track, and got up on top to let off the brake. I think I got onto the car that I coupled onto if I remember right. I didn't see Mr. Bryant on the car after I saw him pass there. So far as I know he was on the ground. After I had gotten upon the car, I think we went two or three car lengths before I saw anything of Mr. Bryant. The car was then going not very fast; but the ordinary gait that we would pull out of a side track. The first I noticed of Mr. Bryant as I bent down to let off the brake, I happened to notice him lying there, and I swung the engine right up. When we stopped, my car had got about opposite the cattle chute. I found Mr. Bryant near the west post. Can't say exactly whether he was lying up against the west side or the center of it.

" *Q.* Were his feet straight out toward the track or were they out directly west from the post ?

" *A.* Well, they were pretty near straight, I should judge.

" *Q.* Then at that time he was on the other side of the cattle chute from where he was when you saw him go across this track ?

" *A.* Yes, sir; the cattle chute is about eight feet wide. I didn't hear any outcry."

At the close of plaintiff's proofs, defendant moved the court to direct a verdict in its favor, which was denied, whereupon defendant called its train dispatcher to prove the signature of Bryant to his application for employment and a photographer to prove certain photographs made by him of the cattle chute and its surroundings, and, thereupon, the proofs were closed. Defendant's counsel presented numerous requests to charge, several of which required a verdict to be directed in its favor, on the grounds that plaintiff had assumed the risk of what occurred, and that he was guilty of contributory negligence. The court declined to direct a verdict and submitted the case to the jury, resulting in a verdict for plaintiff. Defendant has brought the case to this court for review.

The facts in this case are practically undisputed so far as the cause of action is concerned. Plaintiff's intestate was familiar with the location of the cattle chute, and if he exercised ordinary care in the performance of his duties, he must have known that there was not sufficient space for him to pass between the chute and an ordinary freight car. The fact that he may not have known the precise distance by measurement did not relieve him from assuming the risk. That doctrine was repudiated by this court in *Pahlan* v. *Railway Co.*, 122 Mich. 233. The risk was an obvious one which, under our previous decisions, plaintiff's intestate must be held to have assumed. *Phelps* v. *Railway Co.*, 122 Mich. 171; *Pahlan* v. *Railway Co.*, supra; *Bauer* v. *Foundry Co.*, 132 Mich. 537; *Bradburn* v. *Railroad Co.*, 134 Mich. 575.

Plaintiff's intestate was directing the movement of the train in making the coupling. The west end of the stationary car was either opposite to or a few feet east of the east end of the chute, where he had caused it to be placed. He was approaching it at midday on the south side of the track. There was no obstruction to his view, and a casual glance in the direction in which he was walking would disclose the space between the stationary car and the chute. Mr. Bryant was not on the side of a car. He was on the ground where he had full control of his own movements. He knew that the gondola car was approaching, that it was wider than the box car, and what the effect would be of its striking the stationary car. The record does not disclose what his purpose was in crossing to the south side of the track, or how he came to get between the cars and the chute, or which car crushed him, and plaintiff relies upon the presumption of due care obtaining in the absence of evidence to the contrary.

Schneider testified that he knew of no necessity for Mr. Bryant's going on the south side of the track. The two cars were fitted with automatic couplers, and if plaintiff's theory should be accepted, that Mr. Bryant went across the track to open the knuckle of the coupler, this would not require him to go between the cars.

" With the automatic coupler there is nothing for the brakeman to do except to open the knuckle. That is necessary sometimes on certain ones. They are arranged so that you don't have to go between the cars by an operating lever. This is a lever that runs on the end of the car. * * * The lever on the gondola was on the north side and the other on the south side. I didn't see Mr. Bryant do anything before he went across. * * * He might have tried this lever and then went across to operate this other lever for all that I know, but I didn't see him."

The coupling was actually made and the only fact lacking in the history of the accident is as to the manner of Mr. Bryant's getting between the car and the chute. The surrounding circumstances, however, disclosed by the record, negative the presumption that he was in the exercise of

due care.   Under the facts of this case, Mr. Bryant could only have put himself in a position to be injured by the chute by failing to exercise ordinary care for his own safety.

The judgment is reversed.

McAlvay, Montgomery, Ostrander, and Hooker, JJ., concurred.