CARR v. GRAND TRUNK RAILWAY COMPANY OF CANADA.

1. MASTER AND SERVANT — RAILROADS — INJURY TO BRAKEMAN — UNSAFE CONSTRUCTION—STRUCTURE NEAR TRACK—ASSUMPTION OF RISK.

A railroad brakeman who ought, in the exercise of reasonable diligence, to know of the location of a cattle chute near the track, assumes the risk of injury from such structure, whether he knows its exact distance from the track or not.

2. SAME—DUTY OF SERVANT.

A railroad company has a right to rely upon its brakeman using due diligence to familiarize himself with the location of all permanent structures along a siding upon which his duties require him to work.

3. SAME—ASSUMPTION OF RISK—EVIDENCE—SUFFICIENCY.

   In an action by a railroad brakeman for injuries resulting from coming in contact with a cattle chute built too near a side track, evidence examined, and *held*, conclusive that if plaintiff had exercised due diligence he must have discovered the location of the chute, and that therefore he assumed the risk of injury therefrom.

4. SAME—STRUCTURES NEAR TRACKS—CUSTOM—EVIDENCE.

   In an action by a railroad brakeman for injuries resulting from coming in contact with a cattle chute near a side track, evidence examined, and *held,* not to show a custom on the part of defendants and other railway companies to locate their cattle chutes at a safe distance from side tracks such that plaintiff would be justified in relying upon that custom.

Error to Shiawassee; Miner, J. Submitted February 20, 1908. (Docket No. 129.) Decided March 31, 1908.

Case by George P. Carr against the Grand Trunk Railway Company of Canada and the Cincinnati, Saginaw & Mackinaw Railroad Company for personal injuries. There was judgment for plaintiff, and defendants bring error. Reversed.

*H. Geer,* for appellants.

*Watson & Chapman,* for appellee.

BLAIR, J. Plaintiff brings this action to recover damages for the loss of his left hand, which was severed in consequence of an accident at Flushing, on the Cincinnati, Saginaw & Mackinaw Railway, between 6 and 8 o'clock on the evening of December 20, 1902. Plaintiff was a brakeman in the employ of the defendant, and at the time of the accident was in the performance of his duty, riding on the side of a car, when he came in contact with a cattle chute located 3 feet 11 inches from the nearest rail of the side track upon which he was riding. This cattle chute was 16.65 feet from the west rail of the main track and had been in the same location for some 16 years.

The main track of this road passes through Flushing in

practically a northerly and southerly direction. West of this track and extending practically parallel with it for a distance of 1,712 feet was the long siding, so-called. Five hundred feet north of the south switch, which connects this siding with the main line, is the cattle chute; 450 feet north of that, the freight warehouse; and 175 feet south of the north switch of the siding, a bean warehouse. These structures are, as usual, placed near the outer rail of the siding. A side or spur track leads from the long siding in a northwesterly direction for 358 feet to a warehouse used as a storage place for hay and like products. The point at which it leads from the long siding is between the freight house and the cattle chute. East of the main line, and at a point 699 feet north of the south switch above mentioned, is another side track extending approximately 600 feet in a northeasterly direction to within a short distance of the southeast corner of the station building. No structures are placed along this track.

Plaintiff testified:

"The night that I received my injury we pulled over the switch [the south switch] I swung it, and I saw that my draw-bar on the car that we had hold of was open before stepping back, then stepped across onto the main line to let this train back down this side track. I stepped onto the main line so that I could see my fellow-brakeman. As I turned back along the side I walked down the main line. I was about even, perhaps, with the rear car of the train. The first coupling, as I remember it, was just inside of the switch; that is, so that the car would clear a train passing along the main line. I made the coupling. The next one made was down towards—down towards this way (indicating on map). I do not think that I coupled any car that night at or near the stock chute. I could not say how near it was. It might have been a car and a half or two cars from the chute. The next coupling must have been further from the chute for I was still further away from those cars.

"When the train started to pull out of this switch I should judge there were 12 or 15 cars attached to the engine. I arrived at this conclusion by looking ahead at the lights of the engine and fixing the distance in that

manner. That was the only way that I could judge. I never at any time rode cars in this siding past the chute or set them at the chute. All of these cars between where I was and the engine were box cars.

"I knew there was a station at Flushing and also on which side of the track it was located. I also knew there was a siding at Flushing before I received my injury. I knew there was—I did not know what side it was on but I knew where the switch was south of the station. I could not say how early I learned the fact that this switch was there. I could not say that it was ever since I commenced working on the road. I do not remember whether or not I ever threw a switch before that night in all the work I did there. I knew that the side track led from the main track north of the depot. I could not say whether or not I ever did throw that switch before the time of the accident. I knew there was a freight house there. I did not know there was a warehouse at that point. * * * While on the side track I did the signaling from the east side, getting my signals from Dunham. These were back-up signals and easy signals. I know now that when I went to get off these cars and went to the south end for the purpose of putting them on the siding I passed a cattle chute. * * * When Stewart and I were working on the C., S. & M. we frequently switched on the north end of the yard. I generally unloaded freight."

Plaintiff, prior to receiving his injury, had worked for the Grand Rapids & Indiana, the Pere Marquette, the Ann Arbor, and the defendants' railways, either as fireman or brakeman. He was first employed by the defendants on the 28th of March, 1902, and remained with them until June 12th of that year, the majority of his work being done on the Detroit, Grand Haven & Milwaukee Railway. Plaintiff made trips over the Cincinnati, Saginaw & Mackinaw daily between Durand and West Bay City and return, as a brakeman, from April 21st to April 25th, 1902, inclusive; from May 16th to May 18th, inclusive; and June 12th. Plaintiff left defendants' employ in June and went with the Pere Marquette, as a brakeman, where he remained until the 16th of December, when he re-entered defendants' employ as a brakeman. From that date he made round trips on the local

freight between Durand and West Bay City daily until he received the injury complained of.

The train was scheduled to leave Durand northbound at 6:30 a. m., as No. 79, and was due to arrive at Flushing at 7:30 a. m. It was scheduled to leave West Bay City southbound, as No. 80, at one o'clock in the afternoon. Flushing was an important station on the line and more or less work was done there daily by the train crew.

Plaintiff testified that the cattle chute at Flushing was nearer than such structures are upon the Pere Marquette, the Michigan Central, the main line of the Grand Trunk, and the Ann Arbor.

"I have made measurements upon those lines and the cattle chute on the Michigan Central at Owosso is 5 feet 2 inches from the track, and at Ann Arbor it is 5 feet 4 inches; at Laingsburg it is 5 feet 4 inches; at Bath, 5 feet; at Lansing, 5 feet. The cattle chute at Gaines, on the Detroit, Grand Haven & Milwaukee, is 4 feet 4 inches from the track; at Fenton it is 4 feet 5½ inches. The cattle chute at Vernon, on the Ann Arbor, is 4 feet 11 inches; at Cohoctah, it is 4 feet 4 inches. The cattle chute at Holly on the Pere Marquette is 4 feet 10 inches; at Belford it is 5 feet; at Grand Blanc, 5 feet; at Flint, 4 feet 11 inches. The cattle chute at Flint on the Grand Trunk is 4 feet 4 inches. The cattle chute on the C., S. & M. at Lennon is 4 feet 11 inches; at Brent Creek, 5 feet 2 inches; at Mount Rose, 4 feet 6 inches. The chute at Flushing I said was 3 feet 11 inches from the track."

Plaintiff's brother, Frank Carr, testified that he was a conductor, had been a brakeman and had had 10 years' experience in railroading on the Ann Arbor railroad.

"I am familiar with the distance cattle chutes usually are constructed from side tracks in good railroading.

"*Q.* How far are they usually from the side track?
*   *   *

"*A.* 4½ to 5 feet. I have not made special investigation or special measurements on the Ann Arbor. I have made measurements on the M. C. The cattle chute at Owosso was 4½ feet from the track; at Ann Arbor, I think it was 5 feet 11 inches, if I am not mistaken. I measured the C., S. & M. at Flushing and the cattle chute

is 3 feet 11 inches from the track.   These are the only measurements I have made."

One Cavanaugh corroborated plaintiff's testimony as to the measurements made.   Martin and Ehrke, witnesses for the defendants, testified :

"The elevator at Lennon is 4 feet 8 in. from the rail; the stock chute, 5 ft. 3 in. ; the coal bin 3 ft. 3 in. from the rail.   The stock chute at Flushing is 3 ft. 11 in. from the rail; the freight house platform is 4 ft. 6 in. high and 3 ft. 4½ in. from the rail; the hay barn is 3 ft. 4 in. The next station north of Flushing is Brent Creek.   The fence is 3 ft. from the rail; the hay barn 3 ft. 6 in. ; the stock chutes 5 ft. 6 in.   The bean factory at Mount Rose is 3 ft. 4 in. ; the stock chute 4 ft. 9 in.   The stock chute at Burt is 3 ft. 6½ in.   West Bay City was the next station at which I found any structures along the side track. The stock chute at that point was 3 ft. 5½ in. ; the freight house platform 2 ft. 8 in.   These are the structures that I observed on the C., S. & M. between Durand and Bay City.   All of them were located on side tracks.

"Turning to the D., G. H. & M. and commencing at Gaines, the first station east of Durand, I found that the stock chute was 4 ft. from the rail and the hay barn 4 ft. 5 in.   The stock chute at Linden was 3 ft. 9 in.; the freight house platform 3 ft. 1 in. ; the east elevator 4 ft. 6 in. ; and the west elevator 3 ft. 5 in.   At Fenton, the next station, the egg and poultry plant is 3 ft. 5 in., the freight house platform 3 ft. 5½ in. from the rail, and the stock chute 3 ft. 10 in.   At Holly, the next station, the freight house platform was 3 ft. 10 in. ; the stock chute was 3 ft. 9½ in.   At Davisburg, the stock chute was 3 ft. 11½ in. ; the freight house platform 3 ft. 9 in.   At Clarkston, the stock chute is 3 ft. 7 in. ; the freight house platform 3 ft. ; and the stock chute at Waterford is 3 ft. 7 in. At Pontiac, the coal shed is 2 ft. 10½ in. ; the stock chute at Birmingham is 3 ft. 3 in., and at Royal Oak 3 ft. 8 in. All of these buildings and structures which I have described are along the side tracks.   *   *   *

"The first station north of Durand on the C., S. & M. is Lennon.   I found the elevator was 4 ft. 6 in. from the nearest rail, the stock chute 4 ft. 7½ in., and the coal shed 3 ft. 7 in.   At Flushing, the next station, the stock chute was 3 ft. 11½ in.; the freight house platform 4½ ft. high and was 3 ft. 6 in. from the rail.   I did not measure the

hay barn at the time, as that track leading there had been changed a little. I measured the hay barn, which was 3 ft. 3 in. from the closest rail, and the stock chute, which was 4 ft. 3½ in. at Brent Creek; also a fence which was 3 ft. 5 in. high, the end of which joins the hay barn. At Mount Rose the stock chute was 4 ft. 2 in. from the nearest rail. I measured the stock chute at Burt, which was 3 ft. 6 in. This chute has been there as long as I have known the road. These are the measurements I took on the C., S. & M.

"The first measurements I made along the D., G. H. & M. were at Gaines, which is the first station east of Durand. I found the stock chute 4 ft. 1 in. and the hay barn 4 ft. 5 in. from the nearest rail. Linden is the next station. I found the stock chute 3 ft. 10 in. from the nearest rail; the freight house platform 3 ft. 3 in.; the east elevator 4 ft. 5 in. and the west elevator 4 ft. 6 in. from the nearest rail. Fenton is the next station. I found the egg and poultry building 3 ft. 4 in.; the freight house platform 4 ft. 6 in. high and 3 ft. 9 in. from the nearest rail, and the stock chute 4 ft. 2 in. I measured at Holly the freight house platform, which was 3 ft. high; the stock chute was 3 ft. 9½ in. The stock chute at Davisburg, the next station, was 3 ft. 11½ in. and the freight house platform, 3 ft. 10 in.

" I took no measurements at Clarkston because the depot had been burned and the stock chute had been rebuilt. I went from there to Waterford and measured the stock chute, which was 3 ft. 6½ in. from the rail. There was no stock chute at Drayton Plains. I measured the coal shed at Pontiac, which was 4 ft. 11 in. from the rail. The stock chute was on the Michigan Air Line. I did not make any measurements there. It had been rebuilt.

" The stock chute at Birmingham was 3 ft. 7½ in. from the closest rail and at Royal Oak 3 ft. 9 in. I did not go west of Durand at that time.

"When I got off the train this morning I made the measurement here at both the Grand Trunk and Ann Arbor depots. The D., G. H. & M. freight house platform at this village is 2 ft. 10 in. from the rail and the stock chute is 3 ft. 8 in. The stock chute of the Ann Arbor is 3 ft. 8 in. from the rail, and at the east end of Green's elevator it is 3 ft. 4 in. to the nearest rail. There were also some coal bins along the Ann Arbor which

were 3 ft. 1 in. from the rail. All the structures and buildings which I measured were on side tracks. This was true at all stations."

Plaintiff further testified:

"I was acquainted with the manner in which these cattle chutes were placed along the road, also freight houses and coal bins. They were placed along the side tracks. * * *

"I have never seen stock chutes along the main line. * * *

"I did not know the chute was there until after the accident happened. * * *

"When we came to Flushing, the conductor said, 'Hurry up, do quick work. We will get out of here ahead of that passenger.' I did not hurry my work. That is not the reason I was not paying attention. I did not care whether I got out ahead of that passenger or not. I was not going to take my life to satisfy the conductor or take any chances of running against one of those cattle chutes by being in a hurry. The fact that the conductor told us to hurry up did not make any difference with my conduct. I took my time. * * *

"I familiarized myself with the coal bins, cattle chutes and warehouses, also barns along the side tracks. I never thought that they would be close to the track. I saw one close to the track. It was at Flushing. This is the only structure I ever saw near the track. I have seen freight houses near the track, where you load and unload freight. They were always on side tracks. I knew this from what I had seen on other roads. I have looked and found out that it was clear between these structures and that you could get on a car while going past them. I generally rode either on the side or the top, wherever it was convenient. During the two years that I was engaged in railroading I kept my eyes open and watched for these side tracks, as much as I could. I knew that was my duty. * * *

"Q. Mr. Carr, you told Mr. Geer you were always on the lookout to see the surroundings and the different things along the track. You may tell the jury whether or not you had ever before observed a cattle chute as near the track as this one?

"Mr. Geer: I object to that unless he has made measurements. We were yesterday advised as to the only

ones he ever did make. It would be wholesale for him to say that he never saw one as near as that. We expect to show a good many of them that are nearer. Objection overruled. Exception for defense.

"*A.* I never did. * * * I went upon this track at the south end. I should judge the track is about one-third of a mile in length, maybe longer. I never observed the cattle chute before. I had never been down there before."

That such work as he had done at this siding had always been done at the north end.

The station agent at Flushing testified:

" I have a record showing the arrival and departure at our station of trains Nos. 79 and 80 commencing on the 21st day of April, 1902. * * * The entry of April 21st, 1902, is in my handwriting. I can state from this entry that No. 79 arrived at Flushing at 7:40 a. m. and departed at 8:20 a. m. No. 80 arrived at Flushing at 4:30 p. m. and departed at 5:00 p. m. I cannot swear distinctly that any switching was done here on that day. We kept a car record showing the cars taken up by and put off of that train. I have not the car record of April 21st. The first one I have here is dated April 24th. * * *

"*Q.* Take April 22d, and tell the jury what time the train arrived there that day and what time it departed.

" *Mr. Watson:* Objected to, unless it is in his own handwriting. Objection sustained.

"*A.* Train No. 80 is in my own writing, but 79 is the clerk's. * * * No. 80 arrived at 6:25 p. m. and departed at 7:22 p. m. I will say from the general custom of business transacted at that station during the month of April that cars must have been left and picked up by Nos. 79 and 80 that day. The entries of April 23d are in my handwriting and show the arrival and departure of Nos. 79 and 80. No. 79 arrived at 7:40 a. m. and departed at 8:30 a. m. and No. 80 arrived at 6:05 p. m. and departed at 6:25 p. m. I have no record as to what work they did on that day, but from my knowledge of the general custom of the business transacted by those trains at this station, I would say cars must have been left off and picked up. The entry of April 24th as to No. 79 is in my handwriting. It arrived at 7:40 a. m. and departed at 8:45 a. m. No. 80 is in the handwriting of my clerk.

\* \* \* I see from my record of April 24th that a car of merchandise was left at our station. \* \* \*

"The entry in the car register of the 25th is in my handwriting and I can state by referring to it that eight cars were left off by No. 79 the morning of that day, four cars of merchandise, and four empty box cars. These empties were afterward loaded with hay, according to the record. Turning to May 16th, the record of the arrival and departure of 79 and 80 is in my handwriting. It arrived at 8:45 a. m. and left at 9:35 a. m. and No. 80 arrived at 9:16 and departed at 9:45 p. m. I could not state exactly what work was done by this train at our station that day. I does not appear to have picked up any by the record that morning when going north. The record is not clear as to whether any cars were left there. There were a number of cars left but I cannot swear that they were left by them. There was an extra train that day, which arrived from the south at 6:30 and departed at 6:50. \* \* \*

"I should say the record of the arrival and departure of No. 79 on the morning of May 17, 1902, is in my own handwriting. This train arrived at 8:35 and departed at 10:40 a. m. It picked up a car of cattle and took them to Saginaw. When No. 80 went south that day they picked up three car loads of stock from the long siding. This car stood at the chute or just north of it. A car of merchandise was also picked up for Durand and a car of flour for New York. I could not say positively what track this car was taken from. It might possibly have been from the mill. I think the arrival and departure of 79 on the morning of May 19th is in my handwriting. It arrived at 7:30 a. m. and left at 9:30. It set off five cars, three loaded with merchandise and two empties. Turning to the record of June 12, 1902, I find that 79 arrived at 7:30 a. m. and departed at 10:15 a. m. and that No. 80 arrived at 8:10 p. m. and departed at 9 o'clock p. m. No. 79 set off three cars of merchandise that morning, as it appears from the car register, and No. 80 picked up an empty box car for Durand, three cars of wool and one car of hay for Boston, and also a car of merchandise for Durand. December 20th No. 79 set off four stock cars. The record shows that No. 80 took away these four cars and three others that night, one car loaded with beans, one with merchandise, and one with hay. No. 79 arrived at 8 a. m. and departed at 8:42 a. m. No. 80 arrived at 5:48 p. m.

"*Q.* After it arrived there, do you know of its picking up these cars or going out to do it?

"*Mr. Chapman:* Does this appear in his own writing? I object to it and ask to have it stricken out unless it is in his own writing.

"*Q.* Is that 5:48 in your own writing?

"*A.* It is not.

"*Mr. Chapman:* I move to strike it out.

"*The Court:* It may be stricken out unless he knows.
\*      \*      \*

"I am speaking of standard time in giving the arrival and departure of this train. This is the only time we use in railroading. The record which I am testifying from as to the number of cars picked up there on the morning of December 20th is in my handwriting. Also as to taking away cars at night. I got the information from which I made this record by checking the yard myself. I always did this. I could not say that I checked this yard on December 20th after the train had departed that night. It is checked each morning after the day's business. There would be no occasion for me going over there and checking up the cars on the evening of December 20th.
\*      \*      \*      Sometimes they put these cars in one end of the siding and sometimes at the other. I do not know at which end the cars were put in, in April, May and June, or on December 20th. I did not pretend to say to the jury which way they did it."

The negligence relied upon by plaintiff, as stated in the brief of his counsel, is as follows:

"We contend in this case that the negligence of defendant consists in the construction of a side track with a curve so great thereon that it necessitated the work being done on the inside of the curve and then placing a cattle chute so dangerously close to the siding that it would strike a brakeman doing his work in the ordinary manner, when the evidence shows that there was no necessity for building it in that dangerous manner. And that the record further shows that it is not customary in good railroading to have cattle chutes so close and, particularly, that it was not the custom on this particular line of road."

It is further contended by plaintiff's counsel that, since several of the measurements made by defendants' witnesses show less distances between the cattle chutes and

the nearest rail than those given by plaintiff and Cavanaugh, the jury would be warranted in finding all of their measurements inaccurate; and if the jury so found, plaintiff's proofs would authorize a finding that the stock chute at Flushing was closer to the rail than it was customary for railroads, in accordance with good railroading, to place them; that there was no custom known to plaintiff, or actually existing, to place cattle chutes so near to the rail as the one at Flushing, and it was unnecessary to place it so close, for which reasons the case is ruled by *Potter* v. *Railway Co.*, 122 Mich. 179, and *Bradburn* v. *Railroad Co.*, 134 Mich. 575.

The trial court adopted the plaintiff's theory and submitted the case to the jury, who found a verdict for plaintiff. Defendants bring the case to this court for review, contending that the defendants were entitled to an instructed verdict, upon the grounds:

1. That the defendants were not guilty of any negligence.

2. That the plaintiff assumed the risk of the injuries received.

3. That the plaintiff was guilty of contributory negligence.

The jury have credited the plaintiff's testimony that he was ignorant of the existence of the cattle chute, and the important question for consideration, in the absence of the custom relied upon, is, whether such ignorance was excusable, since, if the plaintiff ought, in the exercise of reasonable diligence, to have known of the location of the cattle chute, he must be held to have assumed the risk of such location, whether he knew its exact distance from the side track or not. *Pahlan* v. *Railway Co.*, 122 Mich. 232; *Bradburn* v. *Railroad Co.*, 134 Mich. 575; *Wilson* v. *Railway Co.*, 145 Mich. 509.

It conclusively appears from the testimony that plaintiff's train had passed this chute some ten or twelve different times, in the daytime, when there was nothing to interfere with his seeing it if he looked in its direction;

that he had done work on the siding at different times, and, on the morning of the accident, the train had set off four stock cars, which they picked up on their return at night; that he understood that it was his duty to familiarize himself with the location of permanent structures on side tracks; that plaintiff knew such structures were located on the outside of the side track, and that if he had endeavored at any time to ascertain what structures were located along this siding he could easily have ascertained the location of this cattle chute. The defendants had a right to rely on plaintiff's using due diligence to familiarize himself with the location of all of the permanent structures along this siding, and, in our opinion, the evidence is conclusive that, if he had used such diligence, he must have discovered the cattle chute and its location upon a curve.

Was there sufficient evidence of a custom on the part of these defendants and other railway companies to locate their cattle chutes at a safe distance from side tracks, so that plaintiff would be justified in relying upon such custom? If we consider all of the testimony as to measurements, it appears that many cattle chutes are placed as close to the rail as the one in question, and that there is no uniformity as to their distance from the rail. If we disregard the measurements of defendants' witnesses, it appears that there was no custom to place the chutes at any uniform distance from the side tracks, but that such distances ranged from 3 feet 11 inches at Flushing to 5 feet 4 inches at Ann Arbor. It appears from the testimony that there are numerous other stations on the roads where plaintiff made measurements, where cattle chutes were located, whose distances from the side tracks he did not measure. The few measurements presented by plaintiff of varying distances greater than at Flushing were not sufficient to warrant the jury in finding a general custom to place the chutes at a safe distance from side tracks, against the uncontradicted measurements testified to by defendants' witnesses, even though they found that the

witnesses who testified to such measurements were not entitled to credence.

In our opinion, this case is not distinguishable in principle from *Pahlan* v. *Railway Co.*, supra. The judgment is reversed, and a new trial granted.

GRANT, C. J., and MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred.